195 N.J. Super. 396 (1984)
479 A.2d 447
MARY A. PROCIDA AND JAMES A. PROCIDA, HER HUSBAND, PLAINTIFFS,
v.
THERESA CLINE McLAUGHLIN AND JOSEPH MCLAUGHLIN, DEFENDANTS.
Superior Court of New Jersey, Law Division Camden County.
April 13, 1984.
*398 Edward C. Curcio, for plaintiffs (Console, Marmero, LiVolsi, Wood, Curcio and McMahon, attorneys).
Peter P. Green, for defendants (Green and Lundgren, attorneys).
TALBOTT, J.S.C.
In this damages trial arising out of an automobile accident which occurred on October 21, 1981 the plaintiff, Mary A. Procida, sought to present thermograms taken by Dr. Henry Fichman. The defendant, Theresa Cline McLaughlin, objected to their use. An Evid.R. 8 hearing was held to determine if thermograms may be admitted as reasonably reliable diagnostic tests to support the doctor's diagnosis of post-traumatic cervical strain and sprain and post-traumatic lumbrosacral strain and sprain.
There are no reported cases in New Jersey deciding this issue. Thermography has very recently been developed in the medical field and presented in courts as objective evidence of soft tissue injury in personal injury negligence actions. It has been accepted in other areas of medicine, particularly in the detection of breast cancer, for at least two decades. It is widely used in industry and space for many purposes.
The plaintiff presented as her first expert Dr. Harry Rein. Dr. Rein is licensed to practice both medicine and law in the State of Florida. He is currently Medical Director of Thermographic Medical Associates and supervises clinics in Florida, Ohio and Alaska. He has written numerous texts including The Primer on Thermography, The Primer on Medical Malpractice, The Primer on Soft Tissue Injuries and The Weight of *399 Medical Evidence (Harry Rein, J.D., M.D. 1983) and teaches seminars throughout the United States on these subjects.
It is Dr. Rein's testimony that thermography may be used by a physician to answer the questions of whether or not there is nerve injury, whether or not there is soft tissue injury and whether or not there is a reason for pain. However, he states that the thermogram does not quantify these answers.
Thermography accurately measures differential skin surface temperature by measuring and recording the infrared light emitted by the body. The body constantly emits infrared light which is invisible to the human eye. The wavelength of the emitted infrared light is directly related to the temperature of the point on the body emitting it. In electronic thermography, machine sensors measure the infrared light coming from the body and convert these measures into electronic energy. This energy is then transformed by the computer into a graphic representation of the skin temperature depicted on a television screen. To preserve the depicted graphic representation, called a thermogram, a photograph may be taken. Thus, infrared thermography may be defined as heat photography.
An alternative method to infrared thermography is liquid crystal thermography. This technique involves applying a flexible rubber sheet containing heat-sensitive liquid crystals to the affected area. The sheet can be blown up like a balloon and adapts closely to the body contours. On the liquid crystal scale, the gradual transition from brown (cold) to blue (warm) indicates skin temperature differentials.
Among the instructions given to the patient prior to testing are the following: no smoking two hours prior to the test, no hot or cold beverages one hour prior to test, no lotions or ointments 24 hours prior to test, no physical therapy 24 hours prior to test, no sunbathing two weeks prior to test, no pain medications 24 hours prior to test, and bathe the night before the scheduled examination. Following this protocol, the patient cannot create an abnormal thermogram.
*400 Thermography must be done in a properly prepared setting. The rooms for testing and preparation require temperature stability in the 66-75 degree Fahrenheit range and should be draft free. Fifteen to twenty minutes prior to thermographic examination, the patient's skin must be allowed to cool to a temperature which will become stable when exposed to the surrounding room temperature. The patient is placed in a cooling-dressing room and is required to remain free of pressure contact with clothing, belts, bands, furniture, appliances, the wall or seat if a lower body study is to be done. A proper study consists of three repetitive studies separated by twenty minute intervals and a significant interpretation depends on consistency of the findings with time over all three studies.
After the thermographic examination, the physician must interpret the thermograms to see if a pattern exists. Thermograms are considered normal when the thermal patterns are bilaterally symmetrical. In contrast, thermograms that are asymmetrical or have marked localized differences in the thermal map are abnormal and may indicate an injury.
The test is based upon the physiological principles of the sympathetic nervous system. In general, when a nerve is irritated it will cause a sympathetic overactivity and result in vascular constriction of the small skin capillaries accompanying the nerve. This results in the appearance of a cold spot, as seen by the thermogram machine, in the upper or lower extremity along the course of sensory distribution of the affected nerve. Other injuries, such as bruises or those resulting in inflammation, will cause vasodilation of the involved area. This results in the appearance of a warm spot, as seen by the thermogram machine, in the affected area.
Thermography is objective because a diagnosis of abnormality may be made even without seeing the patient. However, Dr. Rein indicated it is better to use thermographic diagnostic tests in conjunction with the patient's history and other diagnostic tests such as an EMG to arrive at a diagnosis. An EMG is a *401 good test of the motor nervous system, whereas thermography will test both the motor and sensory nervous systems. A combination of these two tests will give a diagnostic accuracy of 90-94%.
Dr. Rein admits that there are differences among advocates of thermography as to certain interpretations. However, he gives the opinion that the thermogram is scientifically reliable and that in most cases a practitioner who understands thermography will interpret a thermogram the same as any other practitioner. There will be clear normal thermograms and clear abnormal thermograms with some difference in the diagnosis of the area inbetween.
George Hershman, Ph.D. in material science, who was qualified as an expert in physics, electronics and thermography, testified as to the construction, operation reliability and self-calibration of the thermographic machine used by plaintiff's physician, Dr. Fichman. The Probeye machine, manufactured by Hughes Aircraft Company, is based upon and developed on principles of electronics and physics. Argon gas, a coolant, is used to hold the detector at a constant temperature. Indium antimonide, a substance sensitive to the range of infrared wavelengths emitted by the human body, is used in the Probeye machine to detect the body's infrared waves. The detectors convert the infrared rays to a voltage signal which is then transformed into a graphic of the emitted temperatures. It was Dr. Hershman's opinion that it was extremely accurate to measure differences in heat. For medical purposes, the machine need only detect a difference in one degree Fahrenheit, yet the machine is capable of detecting temperature differences as minute as one-hundreth of one degree Fahrenheit. If there were any inaccuracy, it would be as to the absolute temperatures, not the differences, revealed by the machine.
The defendant produced Dr. Mark Lapayowker. Dr. Lapayowker was a member of the American Thermographic Society and one of thermography's early proponents. He testified *402 that he is now of the opinion that except for use in breast cancer detection thermography is not reliable since it has never been proved by controlled empirical testing. However, his criticism seems to apply more specifically to the manner in which thermography is used, that is, whether proper safeguards were employed, and more specifically to the manner in which it was used by Dr. Fichman in this case. These criticisms, of course, go to the weight of the evidence.
Dr. Fichman has been qualified as an expert because of his experience, training and education in the medical field. The issue is whether his proffered testimony on his thermography testing of Mrs. Mary Procida is sufficiently reliable so that it will assist the trier of fact to determine the extent of her injuries or whether it is unreliable and thus poses a danger of prejudice, confusion and diversion of attention which exceeds its helpfulness. N.J. Rules of Evidence, Comment 5 to Evid.R. 56(2) (Anno. 1984).
Scientific evidence is admissible if the proposed technique has "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." State v. Cary, 49 N.J. 343, 352 (1967). In the past, this test has been applied to physical tests such as radar, State v. Dantonio, 18 N.J. 570 (1955), polygraphs, State v. Walker, 37 N.J. 208, cert. den. 371 U.S. 850, 83 S.Ct. 89, 9 L.Ed.2d 86 (1962), and voiceprints, State v. Cary, supra, and more recently to hypnosis, State v. Hurd, 86 N.J. 525 (1981) and psychiatric character evaluation, State v. Cavallo, 88 N.J. 508 (1982).
Cavallo outlines factors to be considered in applying Evid.R. 56(2). Application of the Rule entails a weighing of reliability against prejudice in light of the context in which the evidence is offered. Where expert testimony is sufficiently reliable to assist the jury, it should be admitted despite some countervailing dangers. It will then be for the opposing party to discredit the evidence and the jury ultimately to determine *403 its proper weight. One means of proving the reliability of scientific expert evidence is by demonstrating its acceptance in the scientific community. This may be accomplished by any of three methods: "(1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions." Gianelli, "The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later," 80 Colum.L.Rev. 1197, 1215 (1980).
Dr. Rein testified that thermography is accepted by a substantial segment of the medical profession. At this time, there are several thermographic associations, including the American Thermographic Association, the International Thermographic Society and the National Board of Thermography. Thermography is taught as an elective in many medical schools including Johns Hopkins, Georgetown, George Washington University, University of Oklahoma, State University of New York and Veterans Administration Hospitals. In March 1984, a board speciality will be announced.
Over 2,000 articles about thermography have appeared in leading medical journals in America and Europe. Charles E. Wexler, M.D., a leading expert in the field, has written two books on the subject entitled An Overview of Liquid Crystal and Electronic Lumbar, Thoracic, and Cervical Thermography and Atlas of Thermographic Lumbar Patterns (Thermographic Services, Inc. 1978).
Articles on the subject of thermography appear in legal publications. Appleson, G., "Thermograms Show Soft Tissue Injury," A.B.A.J., September 1981, p. 1106; Granelli, J., "Pictures of Pain Pay Off," The Nat'l. L.J., Vol. 5, No. 3, September 27, 1982, p. 1; Breckler, A. "Pain and Suffering," 23 Proof of Facts 2d, 1 Sec. 8, Archer, S., Zinn, J., "Thermograms: Persuasive Tools in Soft Tissue Injury Cases," Trial, Vol. 19, No. 2, February 1983, pp. 68-71; Gershon-Cohen, J., "Thermography in Traumatology and Neurology," Trauma, Vol. 12, February 1971, pp. 3-17.
*404 Thermography has been accepted in the armed forces and industry as a scientifically accurate measurement for many purposes. Because of thermography, underground leaks of the Alaskan pipeline can be detected; fire departments can locate hot spots in the interior of walls; utility companies can detect heat loss and insulation deficiencies in homes and offices; and commercial satellites can search for the presence of vegetation and heat sources.
There are no reported cases in New Jersey admitting thermograms into evidence. Thermograms have been presented in courts of other states as objective evidence of soft tissue injury in personal injury negligence actions. Foreman v. State Farm Mutual Automobile Ins., 416 So.2d 258 (La. Ct. App. 1982); Blanchard v. A-1 Bit & Tool Co., 406 So.2d 773 (La. Ct. App. 1981). In a workman's compensation case, the Louisiana trial court ordered a thermographic examination of claimant to determine the existence and extent of a back injury. Gary v. Dimmick Supply Co., 427 So.2d 33 (La. Ct. App. 1983). Thermography has been used to show the soring of Tennessee walking horses in violation of the Federal Horse Protection Act. Fleming v. United States Department of Agriculture, 713 F.2d 179 (6th Cir.1983) (a thermogram machine is a "heat sensitive device which can reveal abnormal infra-red heat patterns in a horse's legs indicative of inflammation"); Thornton v. United States Department of Agriculture, 715 F.2d 1508 (11th Cir.1983) (the horse's "forelegs were examined under thermovision, a diagnostic device that reads, calibrates and records heat emissions, symptomatic of irritation and inflammation.") The failure to use a thermogram to detect breast cancer was evidence of medical malpractice in two jurisdictions. Jones v. Montefiore Hospital, 494 Pa. 410, 431 A.2d 920 (1981); Tribou v. Gunn, 410 So.2d 378 (Miss. 1982).
This court finds that the thermogram is a diagnostic tool with a sufficient scientific basis to produce uniform and reasonably reliable results. It will be an aid to the jury in this *405 civil case in determining whether the plaintiff has a soft tissue injury. Any dispute as to the results and interpretation of the testing done by Dr. Fichman goes to its weight and will be determined by the jury.