216 N.J. Super. 522 (1987)
524 A.2d 460
ROBERT TONSBERG AND ELLEN TONSBERG, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
VIP COACH LINES, INC., BRIAN SMITH, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 1987.
Decided April 8, 1987.
*524 Before Judges MICHELS, O'BRIEN and LANDAU.
Jeffrey M. Keiser argued the cause for appellants (Ballen, Keiser & Gertel, attorneys; Jeffrey M. Keiser, on the brief).
David N. Zeehandelaar argued the cause for respondents (Bolger, Picker & Weiner, attorneys; David N. Zeehandelaar and Jane C. Rickenbach, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Plaintiffs appeal from the denial of their motion for a new trial based upon the alleged inadequacy of the damages awarded by the jury. We affirm.
Plaintiff Robert Tonsberg (plaintiff) sustained personal injuries while a passenger in a bus owned by defendant VIP Coach Lines, Inc. (VIP) and operated by defendant Brian Smith (Smith). When the bus swerved to avoid another vehicle driven by an unidentified motorist, plaintiff was thrown forward in the bus, thereby sustaining back injuries. Plaintiff Ellen Tonsberg sued per quod.
It was stipulated that VIP and Smith were liable to the extent of 80% and the phantom driver 20%. Defendant Kemper Insurance Company paid $15,000 to plaintiff on behalf of the phantom driver under an uninsured motorist provision. A trial as to damages only against defendants VIP and Smith resulted in a *525 jury verdict in favor of plaintiff of $10,205.99 and zero for Mrs. Tonsberg on her per quod claim.[1]
On this appeal, plaintiffs make the following legal arguments:
I. THE COURT IMPROPERLY EXCLUDED TESTIMONY REGARDING A THERMOGRAM PERFORMED ON PLAINTIFF BY DR. GETSON AND REFUSED TO PERMIT THE OTHER TREATING PHYSICIANS TO COMMENT ON ITS RELIABILITY WHICH EXCLUSION SUBSTANTIALLY PREJUDICED PLAINTIFF'S CLAIM.
II. A MOTION FOR A NEW TRIAL IS APPROPRIATE AFTER A JURY VERDICT WHERE THE VERDICT WAS CLEARLY AGAINST THE WEIGHT OF THE EVIDENCE.
III. THE USE OF DR. WELLS' CONVICTION FOR THE PURPOSE OF ATTACKING PLAINTIFF'S CREDIBILITY WENT BEYOND THAT PERMITTED BY RULE 20 AND RULE 55 OF EVIDENCE.
IV. THE COMMENTS OF COUNSEL WERE SO CLEARLY IMPROPER AND PREJUDICIAL THAT A NEW TRIAL IS REQUIRED.
V. THE EXCLUSION OF PRIOR INCONSISTENT STATEMENTS BY DEFENDANT'S EXPERT, DR. THEODORE KUSHNER WAS NOT PROPER PURSUANT TO EVIDENCE RULE 22. PLAINTIFF'S ATTORNEY SHOULD HAVE BEEN PERMITTED TO SHOW THAT THE DOCTOR MADE INCONSISTENT FINDINGS OF PERMANENCY WHEN THE DOCTOR TESTIFIED AS A PLAINTIFF'S EXPERT TO ESTABLISH BIAS.
At a Rule 8 hearing, plaintiff offered the testimony of Dr. Philip Getson, a doctor of osteopathic medicine licensed in the State of New Jersey. This testimony was offered in support of the admission of a diagnosis of plaintiff's injuries based upon thermography and the admission of the resultant thermograms. In response to a question as to the acceptance of thermography in the relevant community, Dr. Getson testified:
I believe that the acceptance of thermography has grown dramatically in the past two years, that it is at present accepted by a moderate percentage of the medical community and I find that most of the people who are not utilizing the diagnostic tool at present are uninitiated into its purposes, goals and the part that it plays in the diagnostic armamentarium. [Emphasis supplied.]
*526 At the conclusion of the Rule 8 hearing, the trial judge granted defendant's motion to exclude the proffered evidence. The judge based his decision on our opinion in Ferlise v. Eiler, 202 N.J. Super. 330 (App.Div. 1985), where we concluded that a test or technique may be demonstrated to have a "sufficient scientific basis" in any one of three ways:
(1) expert testimony as to the general acceptance of the premise being advanced among those in the profession; (2) authoritative scientific and legal writing indicating that the premise enjoys general acceptance in the professional community; and (3) judicial opinions that indicate that the expert's premise has gained general acceptance. See State v. Kelly, supra, 97 N.J. [178] at 210; State v. Cavallo, supra, 88 N.J. [508] at 521. [Emphasis supplied.] [202 N.J. Super. at 334.]
Since the degree of acceptance must be "general" and Dr. Getson testified to only a "moderate" degree of acceptance, the trial judge concluded there was not a sufficient scientific basis upon which to admit the proffered thermography testimony. The judge observed that another of plaintiff's expert witnesses, an orthopedist, had testified that "the jury was still out" [on thermography] and he really wasn't personally in a position to attest favorably on the subject matter. The trial judge concluded: "It [thermography] is not shown to be generally accepted in the medical community as a reliable diagnostic technique."
The determination of an expert's competency to testify and of the sufficiency, as distinguished from the weight of the testimony, is primarily for the discretion of the trial judge. An appellate court, however, will interfere where there has been a clear abuse of discretion. Fantini v. Alexander, 172 N.J. Super. 105, 109 (App.Div. 1980).
We recognize that evidence based upon thermography was admitted in a personal injury action, after a Rule 8 hearing, in the same courthouse where the instant case was tried. The opinion of the trial court in that case is reported in Procida v. McLaughlin, 195 N.J. Super. 396 (Law Div. 1984). In Ferlise v. Eiler, supra, we acknowledged the conclusion by the trial court in Procida, that a "thermogram is a diagnostic tool with a sufficient scientific basis to produce uniform and reasonably *527 reliable results." There, the expert testified that "thermography is accepted by a substantial segment of the medical profession." 195 N.J. Super. at 404.
We also recognize there was no Rule 8 hearing prior to receipt of the evidence in Ferlise v. Eiler. There, we concluded: "We are unable to say from the record before us that thermography per se is sufficiently reliable and accepted in the medical community as to permit the admission of thermograms in evidence." 202 N.J. Super. 334-335. We further observed that no evidence was offered "that the procedure has been generally accepted in the medical community as a reliable diagnostic technique." Id. at 335. [Emphasis supplied.] Recently our Supreme Court has reaffirmed acceptance of the rule announced in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir.1923), that "general acceptance in the field to which [the technique] belongs," is a crucial factor in finding that there is "sufficient scientific basis to produce uniform and reasonably reliable results." Windmere, Inc. v. International Ins. Co., 105 N.J. 373 (1987) (excluding voice-print evidence). In reliance upon our statement in Ferlise v. Eiler that the technique must be generally accepted, the trial judge here concluded that "moderate" acceptance was inadequate and disallowed the evidence. We do not find such conclusion to be an abuse of his discretion. Future use of thermography as a reasonably reliable scientific method, however, may not be precluded if more thorough proofs as to its reliability are introduced in other litigation. Cf. Windmere, Inc. v. International Ins. Co., supra.
Plaintiff's third point results from disclosure that one of his treating physicians had been convicted of mail fraud. In the course of cross-examining the treating physician as to his treatment of plaintiff, defense counsel asked him about the number of patients he sees per day. In the course of that cross-examination, the following testimony developed:
Q. Well, I guess it's not really that much because some of the time you were in jail, right?

*528 A. That's correct.
Q. Well, let's talk about that federal conviction now for a minute. In September, 1984 you were convicted of fraud; is that right?
A. Mail fraud.
Q. And that concerned one of your patients, one of your medical patients?
A. Correct.
Q. And that patient, what was his name or her name?
A. Patricia Haggerty.
Q. And Patricia Haggerty was involved in a motor vehicle accident, right?
A. Correct.
Q. And came to you for treatment resulting from that accident?
A. Yes.
Q. And she was involved or at least attempting to be involved in a lawsuit because of that accident?
A. That's true.
Q. Personal injury lawsuit just like this case; is that right?
A. Car opposed to a bus.
Q. Same kind of lawsuit?
A. Yes.
Q. Now, in the fraud case, that one was in Pennsylvania, right, or at least the claim was going to be in Pennsylvania?
A. The accident was in Pennsylvania.
Q. And back at that time Pennsylvania had a law that said somebody couldn't sue for a car accident?
MR. KEISER: Objection. I think this goes beyond the proper cross-examination.
THE COURT: I think it's quite proper cross-examination, sir.
MR. ZEEHANDELAAR: Thank you, your honor.
BY MR. ZEEHANDELAAR:
Q. Back at that time, Doctor Wells, in Pennsylvania, you were aware that there was a rule, a law that said you couldn't sue someone unless you had $750.00 worth of medical bills?
A. Correct.
Q. You were aware of that?
A. Yes.
Q. And Patricia Haggerty didn't have $750.00 worth of medical bills?
A. No.
Q. So you faked one for her; is that right?
A. I added visits where no visits existed.
Q. You made up a bill in order to help her with her lawsuit?
A. Yes.
Q. And you knew the reason for that bill was so that she could sue someone?
A. Correct.

*529 Q. And you wanted to help your patient with her lawsuit, right?
A. Yes.
Q. But you got caught?
A. Correct.
Q. Last year?
A. Yes.
Q. The indictment was in the spring of 1984?
A. Correct.
Q. And the conviction was in September of 1984, just 13 months ago?
A. Yes.
Q. And you went to the federal penitentiary for three months; is that right?
A. Yes.
Q. When was that?
A. October 1st of '84.
Plaintiff contends that the doctor's conviction was used to attack the credibility of plaintiff and went beyond that permitted by Evidence Rules 20 and 55. No limiting instruction was sought by plaintiff, nor was any given by the trial judge, either at the time the evidence was received or in his charge to the jury.
Even though this was a civil case, evidence of Dr. Wells' criminal conviction was clearly admissible for the purpose of attacking his credibility. See N.J.S.A. 2A:81-12; see also Harvey v. Craw, 110 N.J. Super. 68, 75 (App.Div. 1970), certif. den. 56 N.J. 479 (1970). While a limiting instruction would have been appropriate, no request was made for such an instruction. Plaintiff must be deemed to have waived such instruction as unnecessary for his protection. See Gindin v. Baron, 16 N.J. Super. 1, 8 (App.Div. 1951). Although the trial judge did not mention the doctor's criminal conviction in his jury charge, plaintiff's attorney said he had "no exceptions to the charge." See R. 1:7-2. We find no error relating to the evidence of Dr. Wells' criminal conviction.
We have carefully examined defense counsel's summation in light of plaintiff's contention that counsel made improper comments. The statements made by defense counsel concerning Dr. Wells' conviction were based upon testimony in evidence *530 and constituted fair comment. Defense counsel conceded that plaintiff suffered a back injury in the accident as evidenced by X-rays taken at the hospital. However, he argued from the evidence that the injuries were not of the serious and permanent nature alleged by plaintiff. It was plaintiff's counsel, in summation, who suggested that defendant was portraying plaintiff as a faker. We find no such contention expressed in defense counsel's summation, only a depreciation of the seriousness of the injuries alleged. We find no error in defense counsel's comments in summation.
On cross-examination of defendant's expert physician, plaintiff's counsel sought to demonstrate through several patients' records and reports that when the doctor appeared as a plaintiff's expert "there was always a permanent psychiatric disability, no matter how trivial the injury," but when he appeared as a defense examiner, "there was never a permanent psychiatric disability, no matter how severe the injury was." It is appropriate under Evidence Rule 22 to confront a witness with prior inconsistent statements to affect his credibility. However, plaintiff's counsel was not confronting the doctor with prior statements concerning the plaintiff in this case, but rather concerning other patients, with other injuries and under other circumstances. Whether the probative value of a particular piece of evidence is outweighed by the risk that its admission will either (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice is a decision normally left to the discretion of the trial judge, and this discretion is a broad one. See State v. Kelly, 97 N.J. 178, 215 (1984); State v. Sands, 76 N.J. 127 (1978). Such a decision will not be disturbed in the absence of abuse.
It is obvious that the attempt to confront the witness with records of some, but not all, of his patients was irrelevant to the issues before the court. Even assuming those cases would demonstrate that the doctor took a different position, substantial time would be necessary to develop the circumstances in *531 which that position was taken. Thus, under Evidence Rule 4, even if relevant, the evidence was properly excluded.
On plaintiff's motion for a new trial, although the trial judge expressed his understanding of plaintiff's chagrin in having his case affected by the criminal conviction of his treating physician, he concluded,
[T]he verdict of the jury, low though it be, doubtless is the result of this jury's impression of credibility of the witnesses.
Although it does not shock the conscience of this court, I must concede, and for the benefit of an appeals review of this subject matter, I will concede and state on the record that I was surprised at the quantum of the verdict. However, the applicable rule, 4:49-1(a), states that the trial judge shall grant the motion if having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses it clearly and convincingly appears that there was a miscarriage of justice under the law. I do not feel that I can justifiably make a finding that there was clearly and convincingly a miscarriage of justice under the law.
As to the verdict of zero dollars for Mrs. Tonsberg, the trial judge held "I don't believe there's any justification for me to disturb that verdict."
R. 4:49-1(a) provides that a trial judge shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." A trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust. Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236 (1971). On review of the trial judge's action, the appellate court "must be concerned with the same norm of decision." Baxter v. Fairmont Food Co., 74 N.J. 588, 599 (1977). However, the appellate court must give due deference to the trial judge's "feel of the case." Id. at 600.
*532 In State v. Johnson, 42 N.J. 146 (1964), Justice Hall described the "wrongness" needed to justify an appellate or trial judge undoing a jury verdict:
While this feeling of `wrongness' is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of `wrongness' can arise in numerous ways  from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others. [Id. at 162.]
After a thorough examination of the record in this case, we are convinced that there was no miscarriage of justice under the law. We cannot say the trial judge erred in sustaining the jury award.
Affirmed.
NOTES
[1] Defendant Caesar's Broadway Regency Hotel & Casino was granted summary judgment "as to all claims."