219 N.J. Super. 208 (1987)
530 A.2d 56
THERMOGRAPHIC DIAGNOSTICS, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
ALLSTATE INSURANCE COMPANY, DEFENDANT.
THERMOGRAPHIC DIAGNOSTICS, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
STATE FARM INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division Camden County.
Decided May 15, 1987.
*209 Michael J. Waldman, for plaintiff (Ferrara and Waldman, attorneys).
Peter P. Green, for defendant Allstate Ins. Co. (Green, Lundgren and Ryan, attorneys).
John M. Palm, for defendant State Farm Ins. Co. (Garrigle, Chierici, Palm and Wright, attorneys).

OPINION
TALBOTT, J.S.C.
This is an action by Thermographic Diagnostics, Inc., (TDI) plaintiff, suing by assignment of insureds of defendants Allstate Insurance Company and State Farm Insurance Company under the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 et seq., for payment of thermographic studies made of these individuals after injuries were sustained in automobile accidents.
TDI contends that it made thermograms of the cervical, thoracic and/or lumber spines of these patients as ordered by medical doctors and chiropractors who considered them necessary for diagnostic purposes. It is owed by Allstate and State Farm in excess of $150,000 in unpaid invoices for over 300 assignees which it represents in this case. The defendants contend that neuromuscular and/or musculoskeletal thermography is not a necessary medical expense since it is still in the research and experimental stage and should not be paid for except under specific guidelines supported by contemporary research. They also contest the fees charged by TDI as excessive *210 and out of proportion to other more widely-accepted diagnostic tests.
Thermography is a relatively new diagnostic tool. Its scientific basis was developed in space and agricultural research. Thermogram means literally a picture of heat. In preparation for a thermographic examination, an individual must follow a strict protocol which eliminates conditions that might affect skin temperature, and just before the pictures are taken the skin is equilibrated with a room temperature of 68° to 74° Fahrenheit. Thermography is the measure of the infared radiation from the skin surface of the human body by a scanner. A control unit then converts these emissions into electronic signals, which are displayed by image on a monitor. Color is introduced into the electronic signal, each color representing an approximate differential of 1° Centigrade. Pictures taken of this image by a 35-millimeter camera preserve the study for diagnostic purposes. The thermogram of a normal individual is symmetrical, one side of the body being the mirror image of the other. If asymmetry occurs, it is claimed that this differential of heat on the skin's surface shows that there is a nerve impingement or irritation at the root of the dermatome which affects that area of the skin. Also, localized areas of heat change may be reflective of disease states that are attributable to musculoskeletal pathology.
This is a case of first impression in this State on the issue of whether thermography is compensable as a reasonable and necessary medical expense under the Personal Injury Protection (PIP) provisions of our no fault statute, N.J.S.A. 39:6A-4. This court in Procida v. McLaughlin, 195 N.J. Super. 396 (Law Div. 1984), addressed the issue of whether thermographic tests could be admitted as evidence in a damages trial. This court found in that case that thermography is a diagnostic tool with sufficient scientific basis to be an aid to the jury. This determination was made from testimony taken in a two-day Rule 8 hearing. This decision was not appealed. However, the Appellate Division in Ferlise v. Eiler, 202 N.J. Super. 330 (App.Div. *211 1985), reversed the admission of thermograms in evidence by the trial court in that case, finding that the proper foundation had not been laid to show that the specific tests performed were reliable.
This trial of the present case, which took place over a six-week period, presented in depth the opinions of doctors and other experts from throughout the United States and Canada concerning the current thinking in the medical profession about the usefulness of thermography as a diagnostic test. There is no question that this testimony showed a deep chasm of disagreement between doctors who are members of the American Academy of Thermography and the American Academy of Neuromuscular Thermography who support its use and those doctors called by the defendants who found it to have no provable value. Local doctors called by both sides presented community opinions.
The subject of thermography has become timely in the medical and legal professions because of the claims of the thermographic community. In some instances it has been advertised as showing a "picture of pain" and therefore helpful to attorneys in presenting their clients' damages claims to a jury by objectively picturing soft-tissue injury in automobile accident cases. This has further led to claims for payment under no fault insurance policies for these costs. Some insurance companies, including the defendants Allstate and State Farm, have refused payment, which raises the issue presented in this case.
The claims of the parties must be tested against the provisions of the statute, which read as follows:

N.J.S.A. 39:6A-4. "Personal injury protection coverage" means and includes:
a. Medical expense benefits. Payment of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident .. .

N.J.S.A. 39:6A-2. Definitions.

As used in the act:
e. "Medical expenses" means expenses for medical treatment, surgical treatment, dental treatment, professional nursing services, rehabilitation services, x-ray and other diagnostic services, prosthetic devices, ambulance services, *212 medication and other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and surgery pursuant to R.S. 45:9-1 et seq., dentistry pursuant to R.S. 45:6-1 et seq., psychology pursuant to P.L. 1966, C. 282 (C. 45:14B-1 et seq.) or chiropractic pursuant to P.L. 1953, C. 233 (C. 45:9-41.1 et seq.) or by persons similarly licensed in other states and nations or any nonmedical remedial treatment rendered in accordance with a recognized religious method of healing.
In essence, this court must decide whether thermography is a necessary and reasonable diagnostic test qualifying for payment under the statute.
To answer this question it is necessary to review the extensive expert medical testimony concerning neuromuscular thermography presented by the parties. TDI presented five doctors in the fields of neurology and orthopedics who use neuromuscular thermography in their practice. All of these doctors are members of the American Academy of Neuromuscular Thermography and the American Academy of Thermography.
Joseph Urrichio, M.D., a practicing orthopedic surgeon in Orange County, Florida, certified by the American Academy of Orthopedic Surgeons testified concerning the medical basis of neuromuscular thermography. He said it is a physiological test that aids primarily in the diagnosis of sensory nerve irritation. He explained that sensory nerves emerge from the spine and travel in recognized patterns called dermatomes, to skin areas. For example, the nerve that emerges at L-4 comes down the buttock and over the front of the thigh and down into the big toe; from L-5 the sensory nerve comes down the side of the buttock and to the middle toes; and from S-1 the nerves come down the back of the thigh into the little toe. These sensory nerves, which allow one to feel sensations, are closely associated with the sympathetic nervous system over which we have no control. He testified that as much as one-third of every sensory nerve is composed of sympathetic nerve fibre. When a sensory nerve gets irritated through trauma or otherwise, the sympathetic nerve fibre associated with that nerve causes vascoconstriction of the capillaries under the skin. Cutting down the size of these blood vessels creates a cooler area on the skin *213 area supplied by that nerve. However, it is only possible to approximate the level at which the irritation occurs since sensory nerves do not correlate exactly to dermatomes. A temperature change often appears on the skin at a dermatomal area one or two levels above or below the irritation. In some cases the temperature change will appear on the side of the body opposite from where the irritated nerve is present. Thermograms are not intended for exact anatomic localization of the irritation. Thermograms do not tell what causes a problem or precisely where it is. Other diagnostic tests are needed to get this information.
However, neuromuscular thermography is the best test for diagnosing the existence of sensory nerve irritation. Its uses are primarily helpful in forming a successful strategy for treatment. Since other tests such as myelograms and Computerized Tomography Scans (CT Scans) give positive results approximately one-third of the time in asymptomatic patients, neuromuscular thermography is indicated as a supplement to a CT Scan to determine whether more aggressive forms of treatment such as a myelogram, hospitalization or surgery are necessary. It is also indicated where patients do not respond to other forms of treatment and it is necessary to determine whether there is an organic basis to pain symptoms.
Dr. Urrichio reported on a study of 1,228 patients in which he compared thermographic results with results from other neurodiagnostic tests. He concluded that abnormal thermograms highly correlated with defects shown by CT Scans and myelograms and also detected abnormalities which were not picked up by those methods.
Jack E. Hubbard, M.D., a neurologist certified in 1983 by the American Board of Neurology and Psychiatry, practices in Minneapolis, Minnesota. He is also an assistant clinical professor at the University of Minnesota. Dr. Hubbard offered testimony on the physiological basis of neuromuscular thermography  how measuring the temperature of the skin's surface *214 could reflect injury or disease within the body. He explained that the sympathetic nervous system regulates skin temperature by controlling the diameter of the small capillaries at the skin surface. If a sensory nerve is damaged or irritated, blood vessel constriction can result in decreased blood flow to the skin resulting in decreased skin temperature. A sympathetic nerve becomes irritated when it is pressed on by an irritated sensory nerve. Sensory nerves tend to travel with sympathetic nerves. Neuromuscular thermography thus demonstrates sensory nerve impairment because of the close relationship between sensory and sympathetic nerves.
Dr. Hubbard testified further that neuromuscular thermography is a physiological test whereas other neurodiagnostic tests such as a myelogram, x-ray and CT Scan are anatomical. A thermogram tells if body structure is working while other neurodiagnostic tests indicate the relationship of one structure to another. In his opinion, neuromuscular thermography is useful in three instances. First, it is useful as a screening tool that helps in deciding whether more invasive and painful tests are necessary. Second, it is useful in locating the organic source of injury that causes patient pain. And third, neuromuscular thermography is useful as a follow-up after surgery if a patient still suffers from pain.
In a study of 805 patients, Dr. Hubbard compared thermographic results with those of Electromyography (EMG), myelography, x-ray and CT Scanning. Correlations were run for patient symptoms and diagnostic results. In his study, positive and negative thermographic results correlated over 80% with patient symptoms; positive and negative thermographic results correlated over 70% with EMG results, and over 80% with CT Scan and myelogram results.
Jacob Green, M.D., a practicing neurologist in Jacksonville, Florida, has specialty certifications from the American Board of Neurology and Psychiatry and from the American Board of Electro-encephalography. He is on the staff of several hospitals *215 and an assistant clinical professor at the University of Florida. Dr. Green also offered testimony as to the physiological basis of thermography. He testified that peripheral nerves, including sensory nerves, emerge from the spinal cord and extend to the external areas of the body. These nerves bring messages involving sensation of feeling in and out of the spinal cord and are distinguishable from motor nerves, which control messages involving movement. Autonomic or sympathetic nerves do not emerge from the spinal cord but "jump on" and intertwine with the sensory nerves in varying manners in different parts of the body. An injury to a sensory nerve will cause the sympathetic nerve to malfunction. This malfunctioning creates a thermographic change by creating a vascular constriction of the small capillaries. This reduction in blood flow to the skin decreases skin temperature. The lines along which these nerves run is a dermatome. A dermatome innervated at the nerve roots will affect a certain area of the skin. There is still much about dermatomes that is not known. For example, it is not clear why only parts of a specific dermatomal area will show thermal changes or why it is that there are variations between people in dermatomal patterns as reflected in a thermogram. A thermogram does not give side, cause or level of involvement, but only indicates that the autonomic nervous system is functioning improperly.
In a study of 100 patients, Dr. Green compared thermographic results with those of other neurodiagnostic tests and found a relatively high correlation existed between thermographic and non-thermographic results. He concluded that neuromuscular thermography is indicated for patients who complain of sensory difficulties that may involve nerve root irritation. In such cases, neuromuscular thermography is a helpful adjunctive tool, which is complementary to other forms of neurodiagnostic testing, it is helpful in forming treatment strategies and deciding whether more invasive and dangerous tests are necessary.
Richard J. Naftulin, D.O., is a board-certified surgeon who practices in Camden County, New Jersey. He testified as a *216 physician who uses neuromuscular thermography in his medical practice since it is an innocuous procedure that is helpful in establishing a diagnosis. For his patients, it is usually not the first test done but it is used only after another neurodiagnostic test yields inconclusive results. For example, a CT Scan may be inconclusive so a thermogram may be ordered before giving a myelogram (a sometimes dangerous test) if a herniated disc is suspected. Thermograms can be a supplemental diagnostic aid in establishing muscle spasm and nerve compression. The value of a thermogram is that it correlates highly with other neurodiagnostic tests.
S. Alan Weinstein, D.O., is certified in general practice by the American College of General Practice. Dr. Weinstein's testimony primarily concerned the clinical uses of neuromuscular thermography. Neuromuscular thermography aids in diagnosing sensory nerve root irritation. He finds it to be useful when there is a suspicion of sensory nerve involvement; then in his opinion thermograms should be used early in treatment. Patients with neurologic changes or radicular complaints would likely receive a thermogram first. Otherwise, neuromuscular thermography is indicated as an assistive device when other neurodiagnostic tests reach an inconclusive finding as to the nature and extent of an injury. In his experience, neuromuscular thermography aids in directing therapy and often makes unnecessary the use of more painful and invasive tests.
The eight medical doctors and others experts who testified for Allstate and State Farm assert that the claims of neuromuscular thermography are not supported by accepted medical principles, properly controlled research studies or clinical experience. Jack Edeiken, M.D., Board Certified in radiology, is currently staff radiologist at the Anderson Hospital and Tumor Institute in Houston, Texas. Dr. Edeiken was a founder of the American Thermographic Society and was an early advocate of thermography for the diagnosis of musculoskeletal injuries as well as the detection of breast cancer. Dr. Edeiken resigned from the American Thermographic Society in the late 1960's *217 over a dispute concerning breast thermography. He stated that sympathetic nerves travel with sensory nerves along dermatomal patterns to the skin surface of the body. However, it was his opinion that the sympathetics do not join the sensory nerves in the usual area of herniated discs. He testified that herniated discs occur primarily in the lumbar area of the spine from L-3 to L-5. He said there are no sympathetics leaving the spinal canal in this area so that pressure put on a motor or sensory nerve that could produce a dermatomal reaction occurs before it is joined by the sympathetic nerve.
He agreed that skin temperature is affected by blood flow and that blood flow is controlled primarily by the sympathetic nervous system, which can cause blood vessels to relax and increase blood flow to the skin or contract and decrease blood flow to the skin. However, he believed that since there are many physiological causes affecting skin temperature change, other than nerve injury, such as skin rubbing, sweating or any condition affecting the hypothalmus in the brain, a positive thermogram is not necessarily picking up a nerve root irritation.
In a preliminary thermography research study published in 1968 involving 93 patients, 20 of whom had clinically diagnosed herniated discs, Dr. Edeiken found that the patients with pathology showed a hot spot in the mid-line heat stripe between the end of the spine and the glutial cleft, while the normal patients did not. Dr. Edeiken concluded at that time that a positive thermogram was confirming evidence of a herniated disc. However, Dr. Edeiken now disavows the accuracy of this study, since the findings were not tested for statistical significance and he has decided that a positive thermogram could indicate many conditions in addition to a herniated disc. He also testified that in his opinion neuromuscular thermography is not accepted by the peer group of osteopathic and neurological physicians. He states that neuromuscular thermography at present is an investigative tool which is used for research *218 purposes but is a useless tool in both the diagnosis and management of musculoskeletal diseases.
Theodore Kushner, M.D., board-certified in psychiatry and neurology, is currently chief of neurology at the West Jersey Hospital System in Camden County and is in private practice in Cherry Hill. He does not use neuromuscular thermography in his practice and has no training in its theory or application. He agreed with Dr. Edeiken that since there are no sympathetic nerves to be damaged at the L-4 or L-5 region of the spinal canal, a herniated disc does not affect the sympathetic nerves as thermographers claim. In the cervical region, a herniated disc would not affect the cervical sympathetic nerves unless the spinal cord were crushed, which is a rare occurrence. Herniated discs usually press on a motor or sensory nerve root but not a sympathetic nerve root since the sympathetics leave the spinal canal at the thoracic area.
Dr. Clifford Ameduri, M.D., board-certified in physical medicine and rehabilitation, is currently the medical director of the Department of Physical Medicine and Rehabilitation at St. John's Regional Health Center in Springfield, Missouri. He has a working knowledge of neuromuscular thermography though he does not use it in his practice. He testified that a multitude of factors can affect skin surface temperature. Body temperature is, in part, controlled by the hypothalmus of the brain. Sweating as well as extremity and peripheral problems such as vascular tumors or soft tissue injury can also cause skin temperature change. He agreed, however, that the primary mechanism of skin temperature control is cutaneous blood flow, which is controlled by the sympathetic nervous system. The sympathetic nervous system originates in the hypothalmus, travels down a section of the spinal cord and leaves the spinal cord between the levels of the first thoracic vertebrae and the first lumbar vertebrae. He stated, as had others, that below the first lumbar to the sacral and lower lumbar area where the motor and sensory nerves leave the spinal cord, there are no sympathetic nerves leaving with them. Therefore, there are no *219 sympathetic nerves to be compressed if a herniated disc occurs at the L-4, L-5 or L-6, L-7 levels. He testified that though it is believed that there are specific nerve distribution patterns in the skin, no researcher has ever been able to match them with specific sympathetics or dermatomes. While the thermographers claim that specific nerve distributions correlate with specific dermatomes this is unproven. Dr. Ameduri also believed that neuromuscular thermography has no standing within the peer group of medical doctors since research studies cannot be reproduced and subjected to scrutiny by medical peers. He believes neuromuscular thermography is still in an experimental stage.
Leon Mahoney, M.D., a general surgeon from Toronto, Canada, specializing in breast disease, was an early advocate of thermography for the detection of breast cancer. His clinical experience led him to discontinue the use of thermography for this purpose but he investigated its application to neuromuscular problems in collaboration with John A. McCulloch, M.D., of Akron, Ohio, a board certified and world renowned orthopedic surgeon. In a study to ascertain the value of thermography in the diagnosis of sciatica, they examined 23 diseased patients and 25 normal volunteers. Of the normal volunteers, 16 demonstrated asymmetry of significant abnormal standards using thermographic standards. However, 12 of the 16 had varicose veins, which could have misled the thermographer. Of the 23 diseased patients, all of whom had classic herniated disc symptoms for at least three months, two had lesions at L-4, six had lesions at L-5 and 15 had lesions at S-1. Thermograms were symmetrically normal in eight cases, assymetry was observed on the correct side in eight and on the wrong side in seven. They concluded that the sensitivity of thermography was so low that it had no diagnostic value.
Drs. McCulloch and Mahoney also conducted a study with Norman Patt, M.D., to determine whether pain relief in the back would produce thermographic changes. Seventy-one patients with mechanical back pain were given local anesthesia in *220 the facet joint. A comparison of pre-injection and post-injection thermograms on the patients revealed no significant statistical correlation between pain relief and change in thermographic pattern nor between pain relief and change in body temperature.
To summarize the medical testimony, the defendants' experts agree that while there is a theoretical basis to thermography, there is no provable use for it by the practicing physician today. TDI's experts differ in some details as to how thermography shows bodily injury or disease and make clear that neuromuscular thermography should be applied with discretion. They would use a neuromuscular exam when patients have sensory complaints such as pain, numbness or dyesthesia (tingling sensations) and there is suspected sensory nerve root involvement. However, they believe that thermographic examination should not generally be given for musculoskeletal injuries such as a sprain or strain prior to six or eight weeks after the onset of these symptoms. The human body's natural tendency towards recuperation from this type of injury makes earlier use of thermography in most instances inappropriate. In such cases, neuromuscular thermography becomes appropriate when patients have not responded adequately to conservative forms of treatment such as bed rest, physical therapy or ice massage. Whether used earlier or later in treatment, the proponents of neuromuscular thermography assert two diagnostic purposes. First, it can be used in conjunction with other diagnostic tests to aid in planning treatment strategy. A thermogram in this instance provides an additional means of determining whether there is an organic basis to a patient's complaint. Second, a thermogram can help in determining whether more invasive and dangerous neurodiagnostic tests such as a myelogram or CT Scan is warranted. Neuromuscular thermograms correlated highly with myelograms, an invasive procedure that requires hospitalization and involves a risk of morbidity through injection of dye in the spinal canal as well as with CT Scans, which involve a statistical element of risk through emission of radiation. *221 When used with the limitations described above, this court finds that neuromuscular thermography is sufficiently supported by credible expert testimony to have medical value.
It is now necessary to examine the No Fault Statute to determine if this expert medical testimony substantiates a basis for payment for thermographic studies. To be a compensable medical expense within the New Jersey PIP Statute, neuromuscular thermography must be a "diagnostic" service that is both "reasonable" and "necessary." N.J.S.A. 39:6A-2.
The parties offer different views as to how the statutory language should be interpreted. TDI contends that the Legislature intended that the statute be interpreted broadly as evidenced by the legislative purposes of prompt and efficient payment of medical expenses and increased judicial economy. Allstate and State Farm contend that the Legislature intended that the statute be interpreted narrowly in accordance with the legislative purpose of lowering insurance rates. Therefore, the presence of the words "diagnostic," "reasonable" and "necessary" are words of limitation and show that the Legislature did not intend that all requested fees fall within the statute.
The duty of a court in construing a statute is to determine the intent of the Legislature. Safeway Trails, Inc. v. Furman, 41 N.J. 467, 477 (1964). Legislation should be interpreted in the context that serves the spirit of the law. Asbury Park Bd. of Ed. v. Hoek, 38 N.J. 213, 231 (1962). Words of statute are to be given their ordinary and well understood meaning, in absence of explicit indication of a special meaning. Safeway, 41 N.J. at 478; Miskofsky v. Ohio Cas. Ins. Co., 203 N.J. Super. 400 (Law Div. 1984).
Justice Handler in Gambino v. Royal Globe Ins. Co., 86 N.J. 100 (1981), discussed the history of no-fault law to determine the legislative intent in its enactment. He said:
The no-fault automobile insurance statute (PIP) was enacted by L. 1972, c. 70. It "encompasse[d] the recommendations of the Automobile Insurance Study Commission created under Joint Resolution 4 of 1970." Sponsor's Statement *222 to L. 1972, c. 70 The Commission believed that four major concerns must be addressed by its legislative recommendations:
(1) The prompt and efficient provision of benefits for all accident injury victims. (The Reparation objective.)
(2) The reduction or stabilization of the prices charged for automobile insurance. (The Cost objective.)
(3) The ready availability of insurance coverage necessary to the provision of accident benefits. (The Availability objective.)
(4) The streamlining of the judicial procedures involved in third-party claims. (The Judicial objective.)
[Automobile Insurance Study Commission, Reparation Reform for New Jersey Motorists at 7 (December 1971) (hereinafter Commission Report)] [Id. 86 N.J. at 105.]
....
The reparation objective was viewed as the "primary purpose of an automobile insurance system" and was given "priority" by the Commission in formulating the proposals which served as the basis for the PIP statute, N.J.S.A. 39:6A-1 et seq. Commission Report, supra, at 41. In short, the goal of the legislation in this regard is "[t]o maximize the flow of individual losses into payable claims ...," Id. at 24, and "to provide an equitable and uniform schedule of benefits for all victims." Id. at 50. The failure of many automobile accident victims to receive any, or adequate, reimbursement for their injuries was considered a major deficiency in the tort liability system that existed prior to the institution of the no-fault law and an unwarranted hardship upon unfortunate victims. Id. at 9-11. See also, Public Hearings before Commission to Study Certain Automobile Insurance Matters, Vol. 1 at 53, 71, 13A, 30A, 46A (March 30, 1971), Vol. 2 at 3, 121 (April 14, 1971), Vol. 3 at 222 (April 21, 1971) (hereinafter Public Hearings). It was believed that once the law became effective, this problem would be alleviated and "victims of accidents involved in private passenger cars will be assured of obtaining prompt compensation for all their economic losses. .. ." Press Release from the Office of the Governor, June 20, 1972. The courts have repeatedly recognized the importance of interpreting the Act so as to realize this goal, finding force in the statutory mandate that the Act be liberally construed so as to effectuate its purposes. N.J.S.A. 39:6A-16. Amiano v. Ohio Casualty Ins. Co., 85 N.J. 85, 90 (1981) ("PIP coverage should be given the broadest application consistent with the statutory language"); accord, Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277, 293 (1974); Brokenbaugh v. N.J. Manufacturers Ins. Co., 158 N.J. Super. 424, 429 (App.Div. 1978); see Service Armament Co. v. Hyland, 70 N.J. 550, 559 (1976) (where the purpose of legislation is "remedial and humanitarian," any exception to its coverage must be "narrowly construed" consistent with that purpose and "the plain meaning of the language").
This liberal construction of the No Fault Act has been followed in subsequent cases. Paul v. Ohio Cas. Ins. Co., 196 N.J. Super. 286 (App.Div. 1984) (24-hour attendant and health *223 care coordinator for quadriplegic were medical expenses, such care having been "prescribed" by medical opinion as to its necessity); Clendaniel v. N.J. Mfrs. Ins. Co., 190 N.J. Super. 286 (App.Div. 1983) (Giving PIP coverage the broadest application consistent with the statutory language held that first party coverage must be given to all for whom basic coverage is provided); Allstate Ins. Co. v. Skolny, 86 N.J. 112, 118 (1981) (Husband was "surviving spouse" where divorce was not final at time of wife's death, interpreting the statutory language to promote prompt payment to all injured persons for all of their losses and to minimize resort to the judicial process); Ideal Mut. Ins. v. Royal Globe Ins. Co., 211 N.J. Super. 336, 339 (App.Div. 1986) (our Supreme Court has favorably noted "approaches which minimize resort to the judicial process"); Figueroa v. Allstate Ins. Co., 209 N.J. Super. 586, 598 (Law Div. 1985) (Refusal to attend physical examination outside municipality of residence did not defeat plaintiff's entitlement to PIP benefits, a primary objective is prompt and efficient payment of benefits); accord, Herold v. Inman, 180 N.J. Super. 581, 588 (Law Div. 1981).
The parties do not dispute that neuromuscular thermography if an acceptable medical test is a "diagnostic" service and therefore a medical expense within the meaning of the statute. The primary dispute in this case is whether thermography is a "necessary" medical expense. The term "necessary" is not defined by the legislation and only one prior case in New Jersey has decided the parameters of a necessary medical expense within the meaning of the automobile no-fault act. In Miskofsky v. Ohio Casualty Ins. Co., the court held that medical expenses incurred as a result of an automobile accident for therapy and heat treatments which were prescribed to ease pain and not to effectuate a cure are "necessary medical expenses" within the meaning of N.J.S.A. 39:6A-1 et seq. The Miskofsky court, following the liberal construction premise of Gambino and citing Mario Iavicoli's No Fault and Comparative Negligence *224 in New Jersey (1973), at 46, uses "need" as the criterion in defining a "necessary medical expense":
To satisfy the requisite as to whether the medical expense incurred was "necessary," one must examine the need for the treatment. Treating physicians enjoy wide discretionary latitude in determining the extent of treatment needed for a particular patient. It is not unusual to witness a genuine dichotomy of medical opinion as to the type and extent of treatment needed for a particular injury.
Other courts throughout the country have defined "necessary" in connection with their No Fault Acts. In Victum v. Martin, 367 Mass. 404, 326 N.E.2d 12 (Sup.Jud.Ct. 1975), the Supreme Judicial Court of Massachusetts had to decide whether or not plaintiff-automobile accident victim's medical expenses were "necessary" in order to meet the $500 threshold required to institute suit against the defendant-motorist. The Victum court held that the "necessary" requirement for medical expenses under the Massachusetts no-fault statute was met since the medical bills were supported by the affidavit of a physician. The Victum court said the Massachusetts Legislature did not intend to impose a standard of absolute liability or indispensible medical need to prove that medical expenses are necessary. Necessity is established if the medical expense is wise in the light of facts known at the time they were rendered and the expense did legitimately arise out of the injuries in the sense that the treatment rendered by a competent medical doctor was a bona fide effort to alleviate and ameliorate the injury. In dicta, the Victum court said that a litigant may not "bootstrap" a claim by running up unjustifiable medical expenses in order to subvert the purposes and ends of the no-fault statute. Thus, where medical services are patently inefficient, excessively repetitious, non-conducive to producing desired medical results, were disproportionately expensive and where the injury is neither objectively visible or well defined, the necessity for medical services may be subject to more searching inquiry.
Two Pennsylvania cases, Carber v. Industrial Distribution Service, Inc., 297 Pa.Super. 423, 444 A.2d 104 (Sup.Ct. 1982), *225 and Miller v. Johnson, 496 Pa. 290, 436 A.2d 1187 (Sup.Ct. 1981), establish that chiropractic services are "necessary and reasonable" medical services within Pennsylvania's No Fault Motor Vehicle Insurance Act. In construing an insurance contract, the District of Columbia Court of Appeals in Group Hospitalization, Inc. v. Levin, 305 A.2d 248 (D.C.App.Ct. 1973), held that "necessary" medical services in an insurance policy included charges by a registered nurse assigned by the insured's surgeon for postoperative care to an insured who was in severe pain.
The Florida decision in Palma v. State Farm Fire and Casualty Company, 489 So.2d 147 (Fla.App. 4 Dist. 1986), is the only reported case in the country deciding whether thermography is a necessary medical expense under a no-fault statute. In that case, the Fourth District Court of Appeals reversed the trial court which held thermography to be of unproven and dubious value in the diagnosis of musculoskeletal disease and nerve root impingement. At the trial, the Palm Beach Circuit Court heard testimony from numerous expert witnesses  many of the same witnesses who appeared in this case  concerning the anatomical basis and diagnostic value of thermography. The Florida no fault statute, which is similar to the New Jersey statute, provides:
(a) Medical benefits. Eighty percent of all reasonable expenses for necessary medical, surgical, x-ray, dental and rehabilitative services, including prosthetic devices, any necessary ambulance, hospital, and nursing services. Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through prayer alone for healing, in accordance with his religious beliefs. [Fla. Stat. Ann. Section 627.736(1)(a).]
Since this statute does not define the term "necessary medical services," the trial court looked to the Workers Compensation Act, Section 440.13, Florida Statutes (1983), and adopted three parts of the definition contained therein. The circuit *226 court concluded that a "medically necessary" diagnostic study as contemplated by Section 627.736(1) must: 1) be widely accepted by the practicing peer group; 2) be based upon scientific criteria accepted by the majority of that peer group; and 3) not be of an experimental or investigative nature. Having thus construed the statute, the circuit court ruled that thermograms did not meet the criteria for "necessary medical services."
The appeals court reversed the circuit court decision. It held that the trial judge's adoption of the Workers Compensation Act definition was error since it was too restrictive. The No Fault Act was to be interpreted liberally in favor of the insured as a matter of law. It also noted that the trial court ignored a decision of the Second District Court of Appeal which held that thermography when "used by qualified health-care professionals ... is a sufficiently reliable and acceptable `scientific-medical' diagnostic procedure, and, therefore, testimony and evidence relating to a particular thermographic study is admissible under appropriate circumstances." Fay v. Mincey, 454 So.2d 587, 593 (Fla. 2nd D.C.A. 1984).
The Florida appeals court further stated that the broad scope of medical services covered by the Act is highlighted by the inclusion of benefits for an injured person who relies on spiritual means through prayer alone for healing in accordance with religious beliefs. It went on to say "here, a board certified radiologist, two board certified orthopedic surgeons, a board certified neurologist, and appellant's treating chiropractic physician all testified that the thermographic examination as relating to appellant consituted necessary medical services." Palma, 489 So.2d at 149-150. While not specifically defining necessary medical expenses, the Florida appellate court by implication required payment, if found necessary and ordered by the treating physician.
*227 Allstate and State Farm contend that this case is distinguishable from Palma because of the differing underlying purposes of the New Jersey and Florida No Fault Acts. They argue that Florida's Act was intended to be construed broadly because it was enacted as a remedial scheme to correct perceived inadequacies in insurance coverage while New Jersey's Act was intended to be construed narrowly since it was enacted to keep the cost of insurance premiums down by providing minimum protection to insureds. This argument is without merit. Both the Florida and New Jersey Acts were intended to be construed liberally. This intent is clear in both the statute and reported decisions. Palma; Gambino v. Royal Globe Ins. Co.
The insurance companies also argue that there is no need for thermograms because they have no value. But this court has already found a sufficient medical basis for the use of neuromuscular thermography. In addition, they assert that a requirement of "necessary" should be neuromuscular thermography's acceptance by a majority of the medical community. This construction would be inconsistent with the broad scope of the No Fault Act. The Act was intended to allow treating physicians wide discretion in determining the diagnostic test as well as the extent of treatment needed by their patients. This latitude includes minority medical viewpoints within the scope of coverage as well as remedial treatment rendered by religious healers.
Under the New Jersey No Fault Act, the "necessity" of a medical expense must be decided by the treating physician, the one most qualified to make such a judgment. It should not be the province of the Judiciary to decide, in the face of conflicting expert medical testimony, highly complex questions of medicine and science. Surely the Legislature could not have intended for the Judiciary to sit in the capacity of a medical board of review. Therefore, this court holds that "need" is shown if the treating physician orders a thermographic test based upon the physician's *228 sincere belief that the procedure will further the diagnosis and treatment of his patient. Of course, abuses of this judgment by the physician, where it can be shown that multiple tests are ordered or tests not warranted by the circumstances are ordered, can receive individual scrutiny and review by a court.
Allstate and State Farm also contest the reasonableness of the charges by TDI for its thermographic studies. They point out that thermography's primary appeal to its providers is financial; that each of plaintiff's expert witnesses has a documented, substantial financial interest in thermography. They add that thermography is almost exclusively linked with litigation: TDI specifically marketed thermography as a litigation aid by having an open house for physicians, insurance representatives and attorneys in the South Jersey area so that they might learn about thermography.
TDI charges the insurance companies and the public in general $325 for a lumbar study, $100 for a thoracic study and $325 for a cervical study. This is the fee set by Dr. Charles Wexler of California, known as the father of thermography. It is the customary amount charged for thermographic tests in New Jersey and throughout the country. However, different fees are charged to members of two limited partnerships established by TDI's managing director. Thermographic Analysis for osteopathic doctors and Diagnostic Thermographic Analysis for chiropractors form a referral base for TDI. These partners are charged approximately $97.50 for a single area thermographic study and just over $200 for a full thermographic series, including a lumbar, thoracic and cervical study. Defendants urge this court to impose this fee standard for all patients.
Allstate and State Farm also contend that thermographic fees are excessive when compared to costs and charges for other diagnostic imaging techniques. The average cost to them for a thermographic exam is $560.30. The cost of a thermogram machine is approximately $40,000. The average fee for a CT *229 Scan is $450 while a CT Scanner costs about $850,000 with a total start-up cost of approximately $1,000,000. A Magnetic Resonance Imaging (MRI) machine costs approximately $1,000,000 while the MRI fee is between $700 and $800.
Neither New Jersey case law nor the legislative history of the New Jersey no fault statute discusses any formula for determining whether medical expenses are reasonable. However, a discussion of what constitutes a reasonable cost within the no fault statute comes from Iavicoli, supra, in his treatise at 41-42:
To satisfy the requisite of "reasonableness" as to medical expenses incurred, one must examine the amount charged for treatment. The amount charged must be gauged for the type of treatment rendered. One must recognize that physicians with varying degrees of qualification, even within one speciality charge varying amounts for similar services. No statutory predetermined amount has been prescribed within the Act as to what constitutes a reasonable expense or charge for a particular type of treatment. One would presume that an amount charged would be reasonable if it is within a range customarily charged for such service within the community and the amount charged compares with amounts charged by such physician to other patients of his receiving similar treatment.
This "community range" formula has been unaltered by subsequent legislation. In 1977, the New Jersey State Legislature refused to adopt the recommendation of a specially appointed committee to study the New Jersey no fault law, which would have established reimbursement schedules for medical fees. This recommendation would have put "caps" on fees as a way of containing costs. However, in September 1986, the Senate Special Committee on Automobile Insurance Reform issued a new recommendation with regard to medical fee schedules:
The committee believes that it is essential that some steps be taken to ensure that there is cost containment with respect to the paying of medical expense benefits under personal injury protection coverage. Reimbursement schedules for health care providers are common in connection with health insurance policies, and the committee believes that the same principal should be applied with respect to reimbursement of providers under automobile insurance policies. *230 Accordingly, the committee recommends that legislation be enacted which requires the Commissioner of Insurance to promulgate reimbursement schedules for health care providers on a regional basis. The fee schedule should incorporate the reasonable and prevailing fees of 90% of the practioners within the defined region. If the number of specialists within a region is less than 50, a statewide standard should apply. The fee schedule would be revised on a biannual basis.
Senate Special Committee on Automobile Insurance Reform, Final Report, September 16, 1986 at 17. Pending legislation adopts this recommendation of the committee. If passed the Commissioner of Insurance will be charged with the responsibility of setting fees for medical expenses. While there is merit in the charge that TDI's fees appear to be different for certain classes of patients and perhaps too high from a cost standpoint, this court refuses to review in detail the accounting basis for these fees believing from the beginning that this is a function best performed by those administering the Act. The Legislature should soon place the responsibility where it ought to be. On the other hand, if the legislation is not passed, this would signal its satisfaction with the present system of fee setting.
In conclusion, this court finds that thermography has a firm scientific basis. While its use for detection of neuromuscular and muskuloskeletal disease is not completely proven, this is true for many medical techniques in use today. TDI has met its burden of establishing its value by a preponderance of the evidence. It is beyond the period of initial research and has medical value if used as a confirming diagnostic test to avoid more invasive tests and to determine if there is an organic basis to nerve root impingement and/or persistent pain. This determination of need must be made by a licensed medical practitioner. While the fees claimed in this case may be disproportionate to some special situations, they conform to the general "community standard" test that has been followed in this State. Therefore, defendants Allstate and State Farm must pay the claimed fees to TDI unless specific abuses can be shown in individual cases.