292 N.J. Super. 11 (1996)
678 A.2d 266
HAHNEMANN UNIVERSITY HOSPITAL, PLAINTIFF-RESPONDENT,
v.
SONYA DUDNICK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 23, 1996.
Decided June 21, 1996.
*14 Before Judges VILLANUEVA, KIMMELMAN and BILDER.
David S. Rochman, attorney for appellant (Rochman, of counsel and on the letter brief).
Greenberg, Shmerelson, Weinroth & Miller, attorneys for respondent (Helene B. Podell, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D. (Retired and temporarily assigned on recall).
Defendant Sonya Dudnick appeals from a judgment of $1,111.11 plus interest and costs in favor of plaintiff Hahnemann University Hospital (plaintiff or the Hospital). We affirm.
This is a collection action for an outstanding balance due on a hospital bill incurred by defendant for treatment at the Hospital. At the time of defendant's hospitalization, she was insured by a policy that provided coverage for ninety percent of the charges up to $10,000; thereafter, the insurance company would pay 100% of the charges. In accordance with the terms of its policy, defendant's insurance company paid $10,601.59 towards this hospitalization. The total amount outstanding after receipt of the insurance payment was $1,111.11, which remains unpaid. After a bench trial, the trial court found defendant liable for $1,111.11 plus interest and court costs.
On appeal defendant claims that the trial court erred by admitting into evidence computer printout records of the Hospital and the Hospital failed to establish the reasonableness and necessity of the charges. She also contends that bias of the trial judge deprived her of a fair trial.
*15 Defendant's contentions are clearly without merit. R. 2:11-3(e)(1)(A) and (E).

I.
The records herein represent a classic example of the type of business records which have been historically accepted as an exception to the hearsay rule and were most recently recognized in N.J.R.E. 803(c)(6). Nonetheless, this case causes us to reexamine the law regarding admission into evidence of computer printouts.
During direct examination of plaintiff's witness Joseph Romano, plaintiff's counsel sought to introduce into evidence the computer printout of defendant's hospital bill. The witness provided testimony in order to establish a foundation to move the documents into evidence. Accordingly, the computer printout (1) was authenticated by a person who was in charge of the records and personally familiar with them, (2) was shown to reflect data recorded contemporaneously with the occurrence of the facts recorded in the usual course of the Hospital's business and (3) was shown to have been recorded in accordance with the Hospital's regular practice. Plaintiff's foundation witness, as the custodian of records with knowledge of the billing procedures, certainly was qualified to testify as to the charges incurred by defendant as contained in the Hospital's bill.
Defendant cites Monarch Federal Savings & Loan Ass'n v. Genser, 156 N.J. Super. 107, 383 A.2d 475 (Ch.Div. 1977), to argue that plaintiff failed to lay the requisite foundation under the business entry exception to the hearsay rule to admit a computer printout into evidence. That case sets forth an outdated six-prong test to be satisfied with respect to admission of computer printouts. To the extent that Monarch suggests the application of special evidentiary requirements for computer-generated business records, we specifically disapprove it.
*16 We recently addressed this issue in the case of State v. Swed, 255 N.J. Super. 228, 604 A.2d 978 (App.Div. 1992), where we remarked that significant advancements had been achieved in computer technology since 1977 and accordingly modified and relaxed the Monarch requirements. We noted also that personal knowledge on the part of the witness to the act or event recorded had been eliminated by the New Jersey courts prior to 1977; therefore, personal knowledge likewise would not be required when computer records were sought to be introduced. Id. at 236, 604 A.2d 978. Moreover, we held that it was sufficient that the computer operators obtained and entered directly into a computer the data which forms the basis of the customer's bill. This practice is considered efficient and standard in the field. Id. at 238, 604 A.2d 978.
Given the major developments that have been made to increase the reliability and accuracy of computers in the past four years, our observation in Swed regarding the computerization of business records is even more applicable today:
With the advent of computers has come an implicit trust in their dependability, owing primarily to the results they achieve. The mechanical (or electronic) explanation of computer workings would likely have been beyond the grasp of most jury members and would not have proved helpful in establishing the reliability of the records.... An explanation of the internal workings of a massive computer system belies common sense and judicial efficiency. Computer usage permeates every strata of society and is customary in modern life.
[Swed, supra, at 238-39, 604 A.2d 978.]
Clearly, the climate of the use of computers in the mid-1990's is substantially different from that of the 1970's. In the 1970's, computers were relatively new, were not universally used and had no established standard of reliability. Now, computers are universally used and accepted, have become part of everyday life and work and are presumed reliable. Indeed, "the American obsession with the computer is intensifying at an astounding pace. Not since the invention of the automobile has a machine had so profound an impact on our lives." Peter M. Storm, Comment, *17 Admitting Computer Generated Records: A Presumption of Reliability, 18 John Marshall Law Review 115 (1984).
Significantly, the Monarch case was decided before the adoption of the new New Jersey Rules of Evidence which became effective July 1, 1993. Monarch relied upon former Evid.R. 63(13):
A writing offered as a memorandum or record of acts, conditions or events is admissible to prove the facts stated therein if the writing or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify its admission.
Today's equivalent to this former rule, N.J.R.E. 803(c)(6), allows the following to be admitted in evidence:
A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

[Emphasis added.]
At the time Monarch was decided, the proponent of a business record had to show that the sources of information from which it was made and the method and circumstances of preparation justified its admission. The evidence rule in effect today is more relaxed than the rule which was in effect in 1977.
Under Fed.R.Evid. 803(6) documents may properly be admitted "as business records even though they are the records of a business entity other than one of the parties, and even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owns and prepared them." Saks Int'l, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir.1987) (citations omitted). Moreover, this rule does not require the testifying witness to have personally participated in the creation of the document or to know who actually recorded the information. United States v. Keplinger, 776 F.2d 678, 693 (7th Cir.1985).
Thus, under both the New Jersey and federal rules of evidence, the foundation witness generally is not required to have *18 personal knowledge of the facts contained in the record. Expert testimony as to the reliability of the programs the computer uses or other technical aspects of its operation is unnecessary to find computer-generated records circumstantially reliable. A witness is competent to lay the foundation for systematically prepared computer records if the witness (1) can demonstrate that the computer record is what the proponent claims and (2) is sufficiently familiar with the record system used and (3) can establish that it was the regular practice of that business to make the record. See, e.g., Shawmut Bank Conn., N.A. v. Connecticut Limousine Serv., Inc., 40 Conn. App. 268, 670 A.2d 880, 885, certif. denied, 236 Conn. 915, 673 A.2d 1143 (1996) (finding that loan officer established the foundation for admission of computer printouts relating to amounts due and owing on various loans secured by pledge agreement through his testimony that he was familiar with procedures by which the bank entered data into computer system, outlining those procedures and stating that he and other bank officers found the procedures reliable). If a party offers a computer printout into evidence after satisfying the foregoing requirements, the record is admissible "unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy." N.J.R.E. 803(c)(6).
There is no reason to believe that a computerized business record is not trustworthy unless the opposing party comes forward with some evidence to question its reliability. Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir.1980) (computer records held admissible absent specific objection to accuracy). Accord United States v. Fendley, 522 F.2d 181, 186-87 (5th Cir.1975) (to make computer records inadmissible, opponent must raise specific, supported objections); United States v. DeGeorgia, 420 F.2d 889, 893 n. 11 (9th Cir.1969) (mechanical accuracy of computer need not be shown to admit printouts unless defendant questions the mechanical accuracy of the computer).
To the extent that Tomassini v. Saunders, 274 N.J. Super. 203, 643 A.2d 665 (Law Div. 1994), relied on Monarch to require a *19 proper foundation for the admissibility of a computerized business record and to arbitrarily reject the printout as prima facie proof of that which it asserted, we reject it.
Plaintiff clearly established the reliability of the bill. The burden then shifted to defendant to offer some evidence that the bill was not reliable. Defendant failed to do so. Therefore, the bill was properly admitted.

II.
Defendant also argues that the plaintiff failed to establish that the charges were reasonable and necessary.
Plaintiff is a Pennsylvania hospital, and defendant is a New Jersey resident. Both Pennsylvania and New Jersey have addressed the issue of the definition and understanding of "usual and customary" medical charges.
N.J.A.C. 11:3-29.2, 11:3-29.4 and 11:3-37.10 address fees and fee schedules in New Jersey hospitals. 26 N.J.R. 4616-4620. In response to public comments, the Department of Insurance (Department) explained that "as frequently stated in the medical fee schedule rules, the standard for reimbursement of PIP medical expenses and equipment is `usual, customary, and reasonable.'" Id. at 4618. In describing medical fee schedules, the Department noted that, "[h]ospitals and other similar facilities are expected to charge their usual, customary and reasonable fees." Ibid. (emphasis added). In evaluating the term "usual, customary and reasonable," the Department stated:
A definition of "usual, customary and reasonable" cannot be added upon adoption of this proposal but must be proposed and [be] subject to public comment. The Department will consider that suggestion for possible future amendment, but notes that this is a generic term of long standing  the meaning of which is generally well understood by insurers and health care providers alike.
The definition contained in the pertinent section of the Pennsylvania regulation is as follows:
"Usual & customary charge  The charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided."

*20 [Hospital Ass'n of Pa. v. Foster, 157 Pa.Cmwlth. 363, 629 A.2d 1055, 1056 (1993) (quoting 31 Pa. Code § 69.3).]
In Hospital Ass'n of Pennsylvania, Inc. v. Foster, supra, the court also analyzed the definition of usual and customary medical charges. 157 Pa.Cmwlth. 363, 629 A.2d 1055. In upholding the definition promulgated by the Pennsylvania Commissioner of Insurance, the court noted that regulations such as this one "are accorded a presumption of validity and reasonableness." Id. 629 A.2d at 1058.
Clearly, "usual, reasonable and customary" is a phrase which has not been defined by statute or code; rather, it is to be defined by health care providers and health agencies. It is a phrase whose meaning is understood by those who set the amounts which they charge. Even though plaintiff did not have the burden of proving that the hospital charges are "usual, customary and reasonable," Romano testified that the charges herein were "in accord with other teaching institutions in the area and that they are approved by the State Insurance Commission." As stated in Thermographic Diagnostics, Inc. v. Allstate Ins. Co., 219 N.J. Super. 208, 229, 530 A.2d 56 (Law Div. 1987): "One would presume that an amount charged would be reasonable if it is within a range customarily charged for such services within the community and the amount charged compares with the amount charged by such physician to other patients of his receiving similar treatment."
In this case, defendant's insurance company paid its full share of all of the charges. It did not reject any of the charges by claiming that they were not usual, customary, reasonable and/or necessary. In addition, defendant offered no evidence that the bill was not usual, customary, reasonable and/or necessary.

III.
Contrary to defendant's argument, we are satisfied that the trial court did not evidence a bias that prejudiced the outcome and ultimate decision in this case.
*21 The trial court asked defendant's counsel how much longer his case would take because counsel was asking questions that were repetitive and which belabored the same points. The trial court posed the question not as a result of any prejudice towards defendant but because it had another case scheduled for that morning.
The trial court had good reason to be annoyed with defense counsel's continuous unwarranted objections to testimony. However, the trial court reacted appropriately and reasonably and treated defendant and her counsel properly at all times throughout the trial. Defense counsel's behavior had no bearing on the trial court's rulings or the outcome of the case since defense counsel had every opportunity to make all of his arguments. The trial court made a determination in favor of plaintiff based on the evidence presented. Defense counsel cannot use his own conduct as a basis for now alleging that the trial court was biased.
Affirmed.