**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0870-16T4

CP# 1109, LLC, a Delaware
LLC,

    Plaintiff-Appellant,

and

MARTIN E. O'BOYLE,

    Plaintiff,

v.

CONTINENTAL MOTORS, INC., a
Delaware Corporation, and
MATTITUCK SERVICES, INC.,
f/k/a TELEDYNE MATTITUCK
SERVICES, INC., a Delaware
Corporation,

    Defendants-Respondents.

_____

Argued May 10, 2018 – Decided August 29, 2018

Before Judges Simonelli, Rothstadt and Gooden
Brown.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Docket No.
L-4837-13.

Jonathan R. O'Boyle argued the cause for
appellant (The O'Boyle Law Firm, PC,

attorneys; Jonathan R. O'Boyle, of counsel and
on the briefs).

Frank J. Vitolo argued the cause for
respondents (Riker Danzig Scherer Hyland &
Perretti, LLP, attorneys; Frank J. Vitolo, of
counsel and on the brief; Thomas M. Kenny, on
the brief).

PER CURIAM

In 2015, plaintiff CP#1109, LLC filed an amended complaint against defendants Continental Motors, Inc. (CMI) and Mattituck Services, Inc. (Mattituck), alleging that CMI's defective engine cylinders caused damage to plaintiff's single engine airplane after they were installed by Mattituck, CMI's authorized service center. Plaintiff asserted causes of action for breach of express warranty, breach of contract, and violations of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, and the Magnuson-Moss Warranty Federal Trade Commission Improvement Act (MMWA), 15 U.S.C. §§ 2301 to 2312.[1]

After a five-day trial conducted from May 5 to 12, 2016, the jury returned a verdict in favor of defendants. Plaintiff now appeals from the conforming final judgment entered on July 13, 2016, arguing reversible trial errors consisting of the admission

---

[1] Plaintiff's amended complaint replaced its original nine-count complaint filed in 2013 and sounding in products liability. The trial court granted plaintiff's motion to file an amended complaint after granting defendants' motions for summary judgment on plaintiff's products liability claims.

of a spreadsheet as a business record, confusing jury instructions, an erroneous jury verdict form, the omission of an adverse inference instruction, and cumulative error. Plaintiff also argues error in the imposition of taxed costs following the verdict. We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised on appeal and affirm.

We recount the facts relevant to this appeal. CMI is a manufacturer of reciprocating engines for general aviation aircrafts. The engine at the heart of this case was manufactured by CMI and ultimately installed in the airplane sold to plaintiff in 2008. Plaintiff purchased the airplane used. In November 2010, plaintiff contacted CMI's customer service team to report a cracked crankcase in the engine in need of repair. CMI recommended sending the damaged engine to Mattituck, CMI's distributor and repair facility located in New York. Plaintiff arranged for Albatross Air, a company in West Virginia where the airplane was located at the time, to remove the engine from the airplane and ship it to Mattituck. Once Mattituck received the engine, they repaired the crankcase and replaced two of the engine's cylinders with new cylinders manufactured by CMI and covered by CMI's cylinder warranty. The repaired engine was then shipped back to

Albatross Air, which reinstalled the engine and returned the airplane to plaintiff.

Subsequently, on September 27, 2012, CMI was notified that an aircraft in Nevada was grounded after the engine, which was manufactured by CMI, overheated. A subsequent investigation of the coolant in the engine revealed that the cylinders were contaminated with casting sand from the factory during the manufacturing process. CMI immediately notified the Federal Aviation Administration (FAA) and instituted remedial measures that were later approved by the FAA,[2] including reviewing manufacturing records to determine what cylinders were potentially affected in order to conduct inspections. As a result of that review, CMI identified fifty-five potentially affected cylinders, including plaintiff's. Some of the fifty-five cylinders were in CMI's inventory, but some, like plaintiff's, had been shipped to distributors and were already in the field. After conducting some inspections, CMI determined that not every part was affected. Rather, some parts had a small amount of sand and some parts had no sand at all.

---

[2] In response to CMI's notification, the FAA concluded that the investigation "indicated the deficiency was not deliberate or intentional . . . nor was there a lack of competency." Moreover, CMI's remedial actions "demonstrated a constructive attitude" towards compliance.

Because CMI did not sell directly to consumers, in order to inspect the potentially affected cylinders in the field, CMI conducted an investigation, which involved a lengthy process of identifying, locating, and contacting the purchasers. The first step in the process was to locate the serial numbers of the affected cylinders and cross-reference those numbers with the sales orders to determine which distributors received the cylinders. Then, CMI had to contact the distributors to ascertain the identity of the ultimate purchaser. Once CMI obtained that information, CMI could then contact the purchasers directly.

In conducting the investigation, CMI's customer service team developed and maintained a spreadsheet used to track the serial numbers of the affected cylinders, the distributors, and, once identified, the ultimate purchasers. The spreadsheet listed any contact CMI had with these individuals or entities. According to the notations on the spreadsheet, CMI emailed Mattituck to determine who purchased the two cylinders Mattituck had placed in plaintiff's airplane engine. Mattituck identified Tim Kearns of Albatross Air as the purchaser. The spreadsheet also indicated that on November 5, 2012, CMI contacted Kearns who identified CP#1109's owner, Martin O'Boyle,[3] as the owner of the airplane.

---

[3] Originally, O'Boyle was a named plaintiff in the complaint. However, the trial judge dismissed O'Boyle from the case on the

Additionally, the spreadsheet noted that CMI contacted Chip Bonner from Southeast Aero Services, Inc. (Southeast), who stated that O'Boyle's airplane was located at his facility in St. Augustine, Florida.

Despite CMI's efforts to identify and notify purchasers, plaintiff claimed it was never notified by CMI and first became aware of the problem on or around January 16, 2013, when Bonner conducted an annual inspection of the aircraft and reported that the engine's water pump was running hot, causing the engine to overheat and rendering the aircraft unsafe to fly. Additionally, plaintiff claimed that after the airplane was returned from Mattituck in 2011, there were problems with the engine, including overheating and lack of power, which conditions progressively worsened. Plaintiff requested a new engine from CMI and incidental costs for having the plane grounded. CMI responded that pursuant to its "component cylinder warranty," it would only be responsible for repairing or replacing the cylinders and components affected by the cylinders, and was not required to provide plaintiff with a new engine. CMI offered plaintiff a $30,000 credit towards either a rebuilt engine, at a cost of $51,906, or a new engine, at a cost of $60,991. Plaintiff rejected the offer and reiterated

last day of trial, ruling that he had "no separate interest" or cause of action in an individual capacity.

its demand for a new engine at no cost, plus consequential damages. After CMI refused, plaintiff sued.

At trial, Martin O'Boyle and William Ring testified for plaintiff. Ring, an attorney and corporate officer of plaintiff, testified about plaintiff's interactions with defendants in connection with the engine repairs, the circumstances under which plaintiff discovered the sand contamination, the failed negotiations between plaintiff and defendants, including plaintiff's claim that defendants reneged on their initial offer to replace the engine free of charge, and the monetary damages sought by plaintiff.

Michael Ernest Ward, CMI's Director of Certification and Airworthiness, testified for defendants. Ward testified about his handling of CMI's special investigation in response to the reported sand contamination as well as the terms of the limited warranty covering the cylinders. According to Ward, the warranty covered each cylinder shipped from CMI on or after April 2, 2010, and was limited to repair or replacement of the component parts, rather than the engine as a whole. The warranty also expressly excluded "incidental or consequential damages arising out of any defect in the cylinders or related part . . . ." The warranty was explained on a "TopCare card[,]" that was included in the cylinder shipments and was available on CMI's website. Typically, the aircraft

mechanic would insert the warranty card in the engine log book along with the other documentation for the aircraft. In rebuttal, Ring denied "receiv[ing] any notification of [the] warranty."

Defendant also presented the testimony of Terry Lee Horton, CMI's designated corporate representative who was qualified "as an expert in the operation, maintenance, and repair" of the same type of engine as plaintiff's. Horton testified that based on his review of the engine log book, there was no dangerous condition reported in plaintiff's aircraft in 2011 or 2013. Rather, according to Horton, following the January 4, 2013 annual inspection, Bonner, whom Horton knew as a competent mechanic, signed the logbook indicating that plaintiff's aircraft was "in an airworthy condition[.]" Further, Horton testified there was no indication of cooling issues in any of the logbook entries after maintenance checks. Although Horton did not examine the pump in plaintiff's airplane, based on his review of the records and photographs, he found no evidence "that there was sand contamination in [the] coolant system" of plaintiff's airplane. Horton testified that if the cylinders installed in plaintiff's engine were contaminated with sand and "if the pump had damage to it caused by sand, you would see erosion." Horton concluded he had "no reason to believe that there was any issue with

A-0870-16T4

airworthiness of [plaintiff's] engine and its ability to perform properly and . . . function normally."

Following deliberations, the jury rendered a verdict in favor of defendants. Pertinent to this appeal, in responding to questions four and five, respectively, on the verdict sheet, the jury found that CMI "issue[d] an express warranty, directly or indirectly, to [plaintiff] pertaining to the cylinders installed" in plaintiff's airplane, but that CMI did not breach same. Other than question four, which was a vote of 6-1, the jury's vote was unanimous on all other questions. This appeal followed.

First, plaintiff challenges the trial judge's admission of the excel spreadsheet, identified as D-44 in evidence, as a business record, arguing that it "failed every prong of the business records test[,]" and was not harmless error because "D-44 was the only evidence presented that challenged" plaintiff's failure to warn theory under the CFA. We disagree.

"A trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" Belmont Condo. Ass'n v. Geibel, 432 N.J. Super. 52, 95 (App. Div. 2013) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). Thus, we will uphold "a trial court's evidentiary ruling . . . 'unless it can be shown that the trial court palpably abused its discretion, that is, that its

finding was so wide off the mark that a manifest denial of justice resulted.'"  Id. at 95-96 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

N.J.R.E. 803(c)(6), known as the business records exception to the hearsay rule, allows the admission of

> [a] statement contained in a writing or other record of acts, events, conditions, and, subject to [Rule] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

"The purpose of the business records exception is to 'broaden the area of admissibility of relevant evidence where there is necessity and sufficient guarantee of trustworthiness.'"  Liptak v. Rite Aid, Inc., 289 N.J. Super. 199, 219 (App. Div. 1996) (quoting State v. Hudes, 128 N.J. Super. 589, 599 (Cty. Ct. 1974)).

In order to qualify under the rule, the proponent must satisfy three conditions:

> First, the writing must be made in the regular course of business.  Second, it must be prepared within a short time of the act, condition or event being described.  Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence.

10

[State v. Sweet, 195 N.J. 357, 370 (2008)
(quoting State v. Matulewicz, 101 N.J. 27, 29
(1985) (footnote omitted)).]

However, the foundation witness need not "have personal knowledge of the facts contained in the record." Hahnemann Univ. Hosp. v. Dudnick, 292 N.J. Super. 11, 17-18 (App. Div. 1996).

Here, after plaintiff objected to the admission of the excel spreadsheet, the judge conducted a N.J.R.E. 104 hearing during which Ward testified that although he was responsible for overseeing CMI's special investigation into the sand contamination, including identifying and contacting purchasers of potentially affected cylinders, it was CMI's customer service department's function to actually identify the affected cylinders and contact the purchasers. Ward testified that Exhibit D-44 was "an Excel spreadsheet that was created by [CMI's] customer service department to track . . . the notification information" and "to document" that "the notification . . . was accomplished."

He testified further that Exhibit D-44 was created by Shaine Little, who had personal knowledge of the acts and events appearing in it, and was created at or near the time of the events appearing in the record. According to Ward, the records were kept in the course of CMI's regularly conducted business activity and it was CMI's regular practice to make such a record in connection with

these types of special investigations, although "[i]t may not be in . . . this specific Excel format."

On cross-examination, Ward indicated that although he did not personally create the spreadsheet, he had personal knowledge of the circumstances of its creation from "conversation with Shaine Little" and "[k]nowing how customer service conducts . . . these types of notifications." According to Ward, it was "the practice in the customer service department," that "when they speak to someone on the phone[,] they will make a notation into this tracking document." He reiterated that exhibit D-44 was created as individuals were contacted during the course of the investigation, from September 27, 2012 to February 2013, and was not created in anticipation of litigation but was rather "a live document that [was] updated during the process" to track the notifications. Ward further testified that in his twenty-three years at CMI, he had received documents similar to Exhibit D-44 on three or four occasions in connection with similar investigations.

Following the hearing, the judge admitted exhibit D-44 to show "who was contacted [by CMI], and when" they were contacted. To support his ruling, the judge determined that Ward was in charge of the investigatory process, had been involved in similar investigations over the years, albeit only three to four, and "in

12

each of the circumstances there has been a compilation of information . . . that[] essentially[] records the type of information that is reported here." According to the judge, Ward's "knowledge of customer service and the way in which they operate, and his particular knowledge of . . . Shaine Little," demonstrated that "the process that was taken here" complied with N.J.R.E. 803(c)(6) inasmuch as the information was supplied "by a person with actual knowledge[.]"

However, the judge limited exhibit D-44's admissibility by redacting any reference to the results of the investigation or any conclusions drawn in connection with the investigation. The judge explained that while a business record made in the regular course of business is admissible, the "record may contain . . . other hearsay that is so far removed from the duty to record" that it "has the ability to create some undue prejudice . . . ." Thus, "[t]o the extent that there is embedded within it another layer of hearsay information having to do with the opinions of others concerning the condition of this engine, that goes to the heart of this question[,]" the judge redacted such information.

We agree that Ward's testimony established the foundational prerequisites for admission of the excel spreadsheet under N.J.R.E. 803(c)(6) as a business record. We reject plaintiff's contentions that the spreadsheet lacked temporal proximity or was

13                                                          A-0870-16T4

created in anticipation of litigation. We also reject plaintiff's attempt to analogize these facts to the facts in Palmer v. Hoffman, 318 U.S. 109, 111-14 (1943), where the Court held that a single incident report that was only prepared due to an unusual accident was not routinely created. Here, Ward had reviewed this type of information in connection with three or four special investigations in Ward's twenty-three years with CMI, and, in every one of them, a document mirroring Exhibit D-44 was created.

Next, plaintiff contends that the jury instructions "were confusing" and "[q]uestion [four] of the verdict form misstate[d] the law of warranties." Plaintiff asserts the judge erred in overruling its objection, warranting reversal. We disagree.

Proper jury charges are essential to a fair trial, Reynolds v. Gonzalez, 172 N.J. 266, 288 (2002), and the failure to provide clear and correct jury charges may constitute plain error. Das v. Thani, 171 N.J. 518, 527 (2002). Indeed, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. Afanador, 151 N.J. 41, 54 (1997).

However, generally, we "will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge,

14

standing alone, might be incorrect.'" Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)). Similarly, "a trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous." Sons of Thunder v. Borden, Inc., 148 N.J. 396, 418 (1997). In fact, when "reviewing an interrogatory for reversible error," the interrogatory should be "consider[ed] . . . in the context of the [jury] charge as a whole," as "[a]n accurate and thorough jury charge often can cure the potential for confusion that may be present in an interrogatory." Ponzo v. Pelle, 166 N.J. 481, 491 (2001).

Here, plaintiff contends that "the [j]ury instructions as it applied to affirmative misrepresentations were confusing when read to the [j]ury in situ" because "the scienter requirement of unconscionable practices elided with the affirmative misrepresentation charge[,]" which, "under New Jersey's Consumer Fraud Act do not contain mens rea as an element." Following the charge, plaintiff's counsel noted that there "may[]be some confusion as to unconscionable practices and affirmative misstatements" as "it just seemed to [him] that they were almost joined at the hip." The judge responded that he "[a]ctually . . . separated them" and determined that the charge was "adequate."

15                                                          A-0870-16T4

We agree with the judge's assessment. In fact, the jury charge tracked the Model Jury Charge (Civil), 4.43, "Consumer Fraud Act" (2011). "Generally speaking, the language contained in any model charge results from the considered discussion amongst experienced jurists and practitioners." Flood v. Aluri-Vallabhaneni, 431 N.J. Super. 365, 383-84 (App. Div. 2013). Thus, there is a "presumption of propriety that attaches to a trial court's reliance on the model jury charge . . . ." Estate of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 596 (2015).

Next, plaintiff contends that question four of "[t]he verdict form allowed the jury to [consider] the terms of an express warranty so long as it was issued directly or indirectly, even if that indirect issuance was unilateral by merely posting the warranty online." We are satisfied that question four was neither confusing nor a misstatement of the law. In any event, some errors or ambiguities on the verdict sheet will not constitute reversible error where, "in the context of the entire trial," it is apparent the jury was not confused. Maleki v. Atl. Gastroenterology Assocs., P.A., 407 N.J. Super. 123, 132-34 (App. Div. 2009). Here, the jury posed no questions about the verdict form and the accompanying jury charge was accurate and thorough.

Next, citing Washington v. Perez, 219 N.J. 338 (2014), plaintiff claims the judge "erred by allowing [defense counsel]

16

to argue to the jury an adverse inference against the [p]laintiff because it failed to produce an expert" after the judge failed to give an adverse inference charge. In <u>Washington</u>, our Supreme Court recognized, as has been long held, that the failure to offer testimony within the party's power to produce permits an inference that the missing testimony would be unfavorable to that party's case. <u>Id.</u> at 352. "Whether a litigant seeks to have the court instruct the jurors on this adverse inference or to urge the inference in closing argument, the trial court has the responsibility to determine if the inference is reasonable under the circumstances of the case." <u>State v. Velasquez</u>, 391 N.J. Super. 291, 306 (App. Div. 2007).

We acknowledge that "[t]his court and others have stressed the need for trial courts to exercise caution in authorizing the inference[,]" <u>ibid.</u>, and that a missing witness charge "will rarely be warranted when the missing witness is not a fact witness, but an expert." <u>Washington</u>, 219 N.J. at 364. However, "it is one thing for counsel in . . . summation to point to the absence of particular witnesses; it is quite another when the court puts the weight of its authority behind such a summation by telling the jury it may draw an adverse inference from their absence." <u>State v. Hill</u>, 199 N.J. 545, 562 (2009) (quoting <u>Wild v. Roman</u>, 91 N.J. Super. 410, 415 (App. Div. 1966)).

17

Here, prior to summations, plaintiff's counsel queried whether defense counsel would "seek[] an adverse inference from the absence of an expert" testifying for plaintiff. Defense counsel responded that he was "going to say there's no expert here for the other side[,]" but he was not going to identify plaintiff's missing expert "[b]y name[.]" The judge responded that he would "certainly permit that." During summation, defense counsel stated "[p]laintiffs have no expert in this case to contradict anything that Mr. Horton said," and "[y]ou'd think they would have an expert who looked at the pump to come in and explain to you this is what the damage shows."

In these circumstances, we are satisfied there was no reversible error. The import of defense counsel's comments was to point out that plaintiff failed to prove its case and failed to rebut defendants' expert with expert testimony of its own. Notably, as represented, defense counsel did not name a missing witness. Unlike a criminal case where "the presumption of innocence and the State's obligation to establish each element of the crime charged . . . must be considered" when the inference is sought against a defendant, Velasquez, 391 N.J. Super. at 309, here, the burden of proof rested squarely on plaintiff. "[C]ounsel has great latitude during closing arguments" as long as comments are "restrained within the facts shown or reasonably suggested by

18

the evidence adduced."  Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 128 (2008) (quoting State v. Bogen, 13 N.J. 137, 140 (1953)).  Here, defense counsel's comments were duly restrained.

Because we find no merit in any of plaintiff's contentions asserting trial error, we reject plaintiff's claim of cumulative error.  See State v. Rambo, 401 N.J. Super. 506, 527 (App. Div. 2008) ("Having found no error, we reject defendant's invocation of the principle of cumulative error.").

Finally, we address plaintiff's assertion that the judge erred when he issued an amended final judgment imposing taxed costs after "the clerk failed to tax costs in the first instance under [Rule] 4:42-8(a),(c)."  Further, plaintiff contends the judge "erred when [he] failed to review costs [p]laintiff challenged under [Rule] 4:42-8(a) . . . ."

The decision to award costs is within the trial court's discretion and is reviewable for an abuse thereof.  Children's Inst. v. Verona Twp. Bd. of Adjustment, 290 N.J. Super. 350, 358 (App. Div. 1996). Rule 4:42-8(a) provides that "[u]nless otherwise provided by law, these rules or court order, costs shall be allowed as of course to the prevailing party.  The action of the clerk in taxing costs is reviewable by the court on motion."  In seeking costs, Rule 4:42-8(c) mandates that

> [a] party entitled to taxed costs shall file
> with the clerk of the court an affidavit

19                                                    A-0870-16T4

> stating that the disbursements taxable by law and therein set forth have been necessarily incurred and are reasonable in amount, and if incurred for the attendance of witnesses, shall state the number of days of actual attendance and the distance traveled, if mileage is charged.

After the jury returned the verdict in defendants' favor, on June 24, 2016, defendants applied to the clerk to tax costs against plaintiff in the amount of $13,068.25, submitting a supporting certification in accordance with Rule 4:42-8(c). Plaintiff did not object to the application. For reasons that are not apparent on this record, the clerk failed to tax costs. However, on July 13, 2016, the trial judge entered an amended final judgment awarding taxed costs in the amount requested payable "no later than twenty . . . days following the service of [the] [a]mended [j]udgment . . . ."

On August 5, 2016, plaintiff moved to review the taxation of costs, claiming the costs were too high and inappropriate. By then, the trial judge had retired. Thus, on September 16, 2016, a different judge adjudicated plaintiff's application and denied the motion. Deferring to the trial judge who was "familiar with" the case, the motion judge explained that plaintiff did not challenge the application previously and "even though they may have been regular costs of litigation," the trial judge may have

assessed the costs "because of how late in the case [defendants] became aware that these people had to be flown in, and the like."

While we would have preferred a more detailed explanation for the trial judge's reasoning, appeals are taken from orders or judgments and not the reasons for them. Ellison v. Evergreen Cemetery, 266 N.J. Super. 74, 78 (App. Div. 1993). N.J.S.A. 22A:2-8 allows "[a] party to whom costs are awarded . . . to include in his bill of costs his necessary disbursements," for "[t]he legal fees of witnesses, including mileage for each attendance . . .;" "[t]he costs of taking depositions when taxable, by order of the court;" "Sheriff's fees for service of process . . .;" "[a]ll filing and docketing fees and charges paid to the clerk of court;" and "[s]uch other reasonable and necessary expenses as are taxable according to the course and practice of the court or by express provision of law, or rule of court."

Defendants' certification submitted in support of the application for taxed costs sought "[d]isbursements" for postage, photocopying, messenger service, Superior Court deposits, recording and filing fees, Sheriff and subpoena fees, and outside duplication costs. Defendants also sought "witness fees" and "deposition[]" expenses for out of state witnesses, including airfare, lodging, car rental, food and associated costs.

In its merits brief, defendants assert the case "was plagued by [p]laintiff's inexcusable delays and gamesmanship, which included a no-show on trial day, the eleventh-hour withdrawal of trial counsel and several unilateral trial adjournment requests." Indeed, on April 28, 2015, the trial judge entered an amended case management order scheduling trial on May 26, 2015. On October 28, 2015, the trial judge dismissed plaintiff's complaint with prejudice and relieved plaintiff's then attorney as counsel, finding that plaintiff "failed to appear for trial" and "[was] not ready to proceed to trial and that plaintiff['s] counsel could no longer continue with his representation of plaintiff[] . . . ." Although the trial judge later reinstated plaintiff's complaint in a December 21, 2015 order, the judge scheduled trial for February 8, 2016, a date that was subsequently adjourned, and granted defendants' motion for attorneys' fees.

Given the trial judge's familiarity with the procedural history of this litigation, we discern this to be the rationale for the judge's determination. Thus, we are satisfied that the record contains ample reasons supporting the judge's exercise of his sound discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0870-16T4