**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3540-21

JOAN GESWALDO, individually,
as a Partner in GESWALDO
ASSOCIATES, as a beneficiary of
the Joseph Geswaldo Trust
Agreement, dated the 17th day of
October 1991, and as the Executrix
of the Estate of GEORGE R.
GESWALDO,

     Plaintiff-Respondent,

v.

CHRISTINE GESWALDO,
individually, as a Partner in
GESWALDO ASSOCIATES and as
Co-Trustee of the Joseph Geswaldo
Trust Agreement dated the 17th day
of October 1991, RACHEL
GESWALDO, individually, as a
Partner in GESWALDO ASSOCIATES
and as Co-Trustee of the Joseph
Geswaldo Trust Agreement dated the
17th day of October 1991, and
GESWALDO ASSOCIATES, a New
Jersey General Partnership,

     Defendants-Appellants.

_____

Argued February 28, 2024 – Decided October 30, 2024

Before Judges Accurso, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000242-20.

Michael S. Kimm argued the cause for appellants (Kimm Law Firm, attorneys; Michael S. Kimm, on the briefs).

Robert A. Knee argued the cause for respondent (The Knee Law Firm, LLC, attorneys; Robert A. Knee, of counsel and on the brief; Stephanie Grigorescu, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Christine and Rachel Geswaldo, sisters, appeal from a General Equity judgment following a one-and-a-half-day trial in favor of their sister-in-law, Joan Geswaldo, the wife of their late brother George, in a dispute over a family trust and real-estate partnership.[1] We affirm, largely for the reasons expressed in Judge DeLuca's clear and concise "Decision after Trial" entered on June 29, 2022.

---

[1] As the parties and the decedents share the same surname, we refer to them by their given names, intending no disrespect by our informality.

A-3540-21

The essential facts are easily summarized. In 1991, Joseph, the siblings' father, set up a trust, which held two assets, a condominium in Florida and a twenty-five percent interest in an entity called Fairfield Park, which owned a large piece of land in Fairfield, New Jersey, rented by a gun club. Joseph was both settlor and trustee. The trust agreement, which was to be interpreted in accordance with Florida law, provided in the event Joseph was unable to continue as trustee, the three children were to serve as co-trustees, with any dispute among them to be resolved by majority rule. Trustees, other than the settlor, were to prepare an annual accounting each tax year. On Joseph's death, the entire trust was to be distributed to Christine, Rachel, and George in equal shares.

The year after he established the trust, Joseph and his children entered into a partnership agreement forming Geswaldo Associates "for the purpose of owning and managing real estate investments." The partnership agreement provides that seventy percent of the net cash flow be distributed to the partners in accordance with their interests at the end of each fiscal year. Partners are permitted to transfer their interest to a spouse or children without prior approval of the partnership, and on death, the partner's personal representative, if a spouse or child, will succeed the partner. In the decade between the

3

formation of the partnership in 1992 and his death in 2002, Joseph gifted his interest to his children, leaving the three of them as equal partners.

The partnership's only asset is a large, multi-tenant commercial building in Lodi.  Although George is named managing partner in the partnership agreement, Rachel testified her father had served as the managing partner, assisted by Christine, for the ten years preceding his death.  Christine received the rents, paid the bills and hired professionals and other workers to maintain the tenant properties.  She testified the partnership had paid the expenses for the Florida condominium, of about $35,000 a year and another $14,000 a year for the siblings' car leases.  Christine turned the partnership books over to George in 2002 or 2003, who managed the partnership until his own death in March 2017.

Christine testified she had known the partnership's income and expenses when she turned the books over to George.  She admitted that her brother, as early as 2004, had expressed being stressed over managing the partnership, and that it was not drawing enough revenue to cover expenses.  She also admitted that she and Rachel had sat down with George about the partnership twice a year from 2002 to early 2017, in which he told them the partnership revenues were insufficient to cover operating expenses and he "was covering as best he

 A-3540-21

could." Christine testified she had asked George repeatedly over those years to see the books and records and that "he maybe showed [her] once" in the early 2000's, "[a]nd everything looked kosher," but that all the other times she asked there "was always an excuse."

Christine acknowledged she and Rachel had received Schedule K-1 partnership tax forms from 2002 through 2015 from George prepared by an accountant, which showed the partnership making a small profit or incurring a loss. She testified she had known the partnership was "losing money," but she didn't know why, which is why she continually asked to see the records.

After George died in March 2017 — leaving his entire estate to Joan — Rachel and Christine discovered there were no funds in the partnership's bank account and that starting in 2015, George had begun depositing the rents and paying the partnership's expenses from his and Joan's personal account at Bank of America. Donald Vogel, Christine's husband, testified that shortly after George's death, George and Joan's son Aaron, a surgeon, and their daughter, Christi, an investment banker, had reached out to him "trying to help us in transferring [the business] over to the two partners, Rachel and Christine," Joan purportedly having no knowledge of George's business affairs.

5

Aaron sent Vogel a text at the end of March stating: "I can get you onboard with Bank of America statements. Everything was borrowed, transferred and finagled, so it's a mess, but we can work it out." Christi provided Vogel with an email of the names of the tenants and their monthly rents in mid-April, noting she had "also discussed with Aunt Chris that all rental checks were made out to George Geswaldo and deposited into [Bank of America], now Joan Geswaldo (only way we can deposit in a joint account where bills and taxes are paid for 'GA')." In the email Christi also noted that "When I called Toronto [Philip Toronto, Esq.] a few weeks ago we were told by Toronto to keep things as is." Vogel also testified he was aware George had listed the building for sale with a broker in 2016. George had asked Vogel "on a few occasions to go to his office with some potential buyers that were going to be visiting him." Vogel testified George "wanted [him] there as an extra set of ears and eyes."

Two months after George's death, Christine and Rachel sued his estate and Joan, individually and as George's executor, in the Chancery Division alleging George had mismanaged the partnership and the trust, shut out his sisters, refused to provide an accounting as to either the partnership or the trust, breached his fiduciary duty, engaged in self-dealing, breached the

A-3540-21

covenant of good faith and fair dealing and converted assets. That action was voluntarily dismissed by stipulation in August 2017. In October, Christine and Rachel filed essentially the same action in the Law Division, seeking damages. That action was also dismissed by stipulation two years later in August 2019.

Joan filed this action against Christine and Rachel in the Chancery Division in December 2020 on her own behalf as a partner, as a beneficiary of the trust, and as executor of George's estate, for breach of fiduciary duty, seeking an accounting and the appointment of a receiver for the partnership, and an accounting and removal of defendants as trustees of the trust. Christine and Rachel counterclaimed for fraud, breach of fiduciary duty, self-dealing, embezzlement, and conversion. They alleged George had embezzled monies from the partnership and that Joan conspired with him to divert the rents from the Lodi building to their personal account. After Joan filed this action, Christine and Rachel moved in the Law Division to "reinstate" their 2017 Law Division action; that motion was denied, as was their motion to dismiss this case to permit the Law Division action to move forward.

By the time of trial in March 2022, Christine and Rachel had been in full control of the trust and managing the partnership for nearly five years. They admitted during their testimony they had not made any accounting to Joan of

the trust assets and had barred her from the Florida condominium. Although the Fairfield Holdings property had been sold, they had not taken steps to obtain the trust's share of the proceeds, which had apparently been escrowed at closing.

Christine and Rachel testified they had not yet filed tax returns for the partnership and admitted they had not provided Joan distributions of the partnership's annual net cash flow as required by the partnership agreement or notified her why they were not doing so. They admitted they had refused to provide Joan with any information about the partnership and entered into an agreement to sell the Lodi property for $1,150,000 without telling her. Joan learned of the sale only because the buyer's title insurer insisted on having her consent to the sale as required by the partnership agreement. When she balked at having her share of the proceeds escrowed, Christine and Rachel cancelled the sale, returning the buyer's $77,000 deposit. They testified that Joan was not a partner and there was no requirement that they treat her as one.

Joan successfully objected to Christine and Rachel testifying as to documents retrieved from George's computer after his death and produced to them by Joan's former counsel about which they had no personal knowledge. They did not call an accounting expert to testify about any reconciliation of the

8

partnership income flowing into George and Joan's personal account or the disbursements for partnership expenses flowing out of it. Their case was based on there being $66,243.54 net profit in the partnership's account on June 30, 2021, after four years' operation despite their having to pay significant delinquent water bills and make capital improvements after George had allegedly let the building fall into disrepair.

On cross-examination, however, Christine admitted the partnership's yearly net profit over that period would be approximately $16,500 and that the partnership was no longer paying the $14,000 annually in car leases and had been renting the space George used to occupy for his business without paying rent — leading Joan's counsel to note that Christine and Rachel appeared to be making no more money than George was when he was managing the partnership. Christine claimed that was incorrect because the partnership had been forced to spend $300,000 in capital improvements over the five years she and her sister had been managing the property. When Joan's counsel asked Christine to identify those capital expenditures in the exhibit Rachel had prepared listing all the partnership's maintenance expenditures over the same period, Christine could identify only approximately $100,000 in capital expenditures, or an average of about $20,000 per year. Joan did not testify.

9

After hearing the evidence and reviewing the post-trial briefs, Judge DeLuca found that after George's death, plaintiff had become a partner in Geswaldo Associates in accordance with the unambiguous terms of the partnership agreement, and that Christine and Rachel had improperly "shut Joan out from information relating to the partnership." Specifically, the judge found that "[n]otwithstanding Joan's clear status as a partner, defendants chose to ignore her rights and failed to make any partnership distributions to her, provide her with K-1 partnership statements or provide any financial information or any other records related to the Partnership."

The judge cited other transgressions on Christine and Rachel's part, including: failing to appoint a managing partner; failing to file tax returns for the partnership; entering into the contract to sell the Lodi property without advising Joan and then terminating the contract after she learned of the sale and insisted on receiving her share of the proceeds. Judge DeLuca found "[s]uch actions are a clear breach of defendants' fiduciary duties to Joan and cannot continue."

The judge accordingly removed Christine and Rachel as managing partners and appointed a receiver to liquidate the partnership and distribute the assets to the partners. "[B]ased upon the information currently available,"

10

however, the judge found he was not in a position "to determine what adjustments/damages, if any, regarding the distributions to each partner may be appropriate" and thus ordered Christine and Rachel to provide a formal accounting of the partnership from "the date of George's death to the present."

As to Joan's claims regarding the trust, the court found Christine and Rachel had failed to provide Joan, as George's successor beneficiary, any information about the trust, including the annual accountings required and had barred her use of the Florida condominium. The judge also found Christine and Rachel had the opportunity to sell the condo in 2017 for $375,000 but did not do so, thus continuing to incur its carrying costs.

Although finding Christine and Rachel's acts in dealing with the assets of the trust were contrary to its terms, the judge also found no one had "adequately explained" why the assets were not distributed equally among Christine, Rachel and George on their father's death as the terms of the trust required. Although not removing Christine and Rachel as trustees, as they had simply continued the past practice when George was alive of not distributing trust assets and having the partnership pay the carrying costs of the condominium, the judge found the failure to abide by the trust agreement and distribute its assets could not be countenanced. The judge ordered Christine

11

and Rachel to immediately list the condominium for sale, keeping Joan and her counsel fully apprised of all their actions. The judge further ordered Christine and Rachel to file a formal accounting of the trust's assets from the date of George's death and that the proceeds of any sale should be placed in escrow pending further order of the court.

Judge DeLuca rejected Christine and Rachel's counterclaim alleging that George had embezzled funds from the partnership and that Joan had conspired with him to divert the rents received from the Lodi property. Based on the evidence at trial, the judge found George had advised his sisters "the partnership was unable to meet its financial obligations" as early as 2002, and "the K-1 statements provided to [them]" admitted in evidence "reflect no income to the partnership." The judge found Christine and Rachel knew, or should have known as general partners, that "they were entitled to full and complete access to the books and records of the partnership" and as co-trustees that they were entitled to accountings from the trust.

"Based upon the testimony presented at trial," Judge DeLuca "reject[ed] the assertion of defendants that it was not until the delivery of discovery in the prior Chancery action that they became aware of George's activities." He found Rachel and Christine knew the partnership was struggling financially, as

12

George had advised them. "Defendants had the ability more than six (6) years before the filing of this action to review George's activities with respect to the partnership and/or trust and chose to take no action," preferring instead to "wait[] until after George's death before pursuing such claims."

The judge found Christine and Rachel's claims for breach of fiduciary duty and fraud resulting in purely economic loss were subject to the six-year statute of limitations in N.J.S.A. 2A:14-1, and those claims accrued on the date of the act or omission giving rise to the claim or when such should have been reasonably discovered. Because Christine and Rachel had access to the books and records of the partnership and are co-trustees of the trust, the judge found "they could and should have reasonably discovered the actions of which they are now complaining." Judge DeLuca found Christine and Rachel's counterclaim for breach of the trust agreement, breach of the partnership agreement, breach of the covenant of good faith and fair dealing and conversion were likewise barred by the six-year statute of limitations or latches given their delay in asserting their claims until after George's death.

Finally, Judge DeLuca found that even if not time-barred, the evidence did not support Christine and Rachel's "claim that George or Joan improperly took any monies belonging to the partnership or the trust or that the

13

intermingling of funds in their personal accounts damaged" defendants in any fashion. The judge noted that Christine and Rachel had not presented the testimony of a "forensic accountant or other professional to support their claims against George . . . or Joan." He found their testimony and that of Vogel "was insufficient to support their claim for damages."

Christine and Rachel appeal, raising the following issues for our consideration:

> I. THE CHANCERY COMPLAINT FILED BY JOAN GESWALDO SHOULD HAVE BEEN DISMISSED OUT OF HAND FOR HER/ RESPONDENTS' UNCLEAN HANDS, ILLEGALITY, LACKOF CANDOR TO THE COURT, LACK OF FAIRNESS TO AN ADVERSE PARTY, AND FOR IMPERMISSIBLE JUDGE-SHOPPING.
>
> II. THE CHANCERY COURT WRONGLY REJECTED JOAN/RESPONDENTS' OWN SWORN ADMISSIONS AND DISREGARDED KEY EVIDENCE AMONG THE PARTNERSHIP'S INTERNAL BUSINESS RECORDS, THE RESULTING JUDGMENT SHOULD BE VACATED AND THE PARTIES SHOULD BE DIRECTED TO PROCEED TO TRIAL PROPER IN THE LAW DIVISION.
>
> A. Evidence of Commingling and Embezzlement Is Overwhelming.
>
> B. Adverse Inference Against Joan Was Warranted.

C. Liability and Damages Should Have Been Held Against Respondents.

III. JOAN SHOULD HAVE BEEN PRECLUDED FROM ANY RECOVERY AND FROM ATTEMPTING TO APPOINT HER AS "A PARTNER"AFTER HER SWORN CERTIFICATION STATING SHE WAS NOT A PARTNER.

IV. BECAUSE EVEN RESPONDENTS' OWN PUTATIVE ACCOUNTING EXPERT ADMITTED RESPONDENTS' COMMINGLING AND ILLEGAL ACTS, THE COURT BELOW SHOULD NOT HAVE GRANTED ANY RELIEF SOUGHT BY JOAN.

They restate these issues in their reply brief:

I. JUDICIAL ESTOPPEL IS WARRANTED BECAUSE THE STIPULATION TO SUSPEND AND RESUME IN THE LAW DIVISION, INDUCED BY JOAN GESWALDO, WAS BINDING UPON JOAN GESWALDO AND HER NEW COUNSEL REGARDLESS OF THEIR ARTIFICE AND TRICKERY.

II. BECAUSE THE CHANCERY JUDGE FAILED TO APPREHEND FACTS AND KEY EVIDENCE THAT WOULD HAVE BEEN FOUND AS "OVERWHELMING" BY ANY LAY JURY, AS TO THE FORMER MANAGING PARTNER AND HIS WIFE'S LONG RUNNING COMMINGLING AND EMBEZZLEMENT, REMAND SHOULD BE TRIED TO A LAY JURY.

III. JOAN GESWALDO SHOULD HAVE BEEN PRECLUDED FROM ANY RELIEF AND FROM ATTEMPTING TO APPOINT HERSELF AS "A PARTNER" IN LIGHT OF HER REPEATED

15

ADMISSIONS THAT SHE WAS NOT A PARTNER
AND RETAINED NO SUCH RIGHTS.

IV. THE TRIAL COURT'S APPOINTMENT OF A
RECEIVER, COUPLED WITH ITS ABJECT
FAILURE TO DIRECT SUCH RECEIVER TO
INVESTIGATE THE EMBEZZLEMENT AND
COMMINGLING BY THE FORMER MANAGING
PARTNER AND HIS WIFE, IS AN EGREGIOUS
ERROR.

V. RESPONDENTS' FALSE REPRESENTATIONS
TO THE TRIAL COURT REGARDING
APPELLANTS' DOCUMENT PRODUCTION,
AFTER COUNSEL'S OWN CONFIRMATION OF
RECEIPT OF DISCOVERY, AND LACK OF
MOTIONS IN LIMINE, REVEAL BAD FAITH.

Our review of the testimony and documentary evidence presented at trial, as well as the briefs, the voluminous appendices, and the transcripts of the pre-trial motions Christine and Rachel contend were wrongly decided, convince us that none of these issues has any merit and warrant only brief comment here. See R. 2:11-3(e)(1)(E).

Final determinations of the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests

16

of justice." In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Because there is substantial evidence in this record to support Judge DeLuca's findings and conclusions, Christine and Rachel have provided us no grounds on which to reverse.

The stipulation Christine and Rachel's counsel filed in the prior Law Division action states "[t]he matter in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that plaintiffs' Complaint and defendants' Counterclaim be dismissed without prejudice, and without costs." Joan did not file this action until eighteen months later. Christine and Rachel presented no proof that Joan or her counsel ever stipulated to have this case heard in the Law Division, and Christine and Rachel did not file their motion to "reinstate" their Law Division case until after Joan had filed this action. In addition, we agree with Judge DeLuca's finding that given the variety of equitable relief requested, removal of managing partners and trustees, appointment of receivers, accountings and the court-ordered sale of assets, "[i]t's a Chancery case. It's a partnership dispute. Partnership disputes belong in [Chancery]."

A-3540-21

Christine and Rachel offer no argument challenging the court's finding that their claims are barred by the statute of limitations and laches. That finding, based on Christine's and Rachel's admissions at trial and the K-1 forms, is sound — and dispositive of defendants' appeal of the dismissal of their counterclaims. As our Supreme Court has explained, "the 'primary purpose' of 'our general statute [of limitations], N.J.S.A. 2A:14–1, . . . is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend.'" Fox v. Millman, 210 N.J. 401, 415 (2012) (quoting Hous. Auth. of Union City v. Commonwealth Trust Co., 25 N.J. 330, 335 (1957)). The court also correctly applied the doctrine of laches to bar Christine and Rachel's equitable claims. See id. at 417 ("Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party.") (quoting Cnty. of Morris v. Fauver, 153 N.J. 80, 105 (1998)).

We find no support for Christine and Rachel's claim that the "evidence of commingling and embezzlement [was] overwhelming." Although there was no question that George commingled partnership funds with his and Joan's personal assets, as their son Aaron had advised Vogel within weeks of

George's death, Christine and Rachel produced no evidence whatsoever of embezzlement.[2]

As for defendants' argument that the court erred in excluding documents found on George's computer after his death relating to the partnership over Joan's objection, we review a trial court's decision to admit or exclude evidence only for abuse of discretion. Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). To lay a foundation for the admission of a computerized business record, "the witness (1) [must] demonstrate that the computer record is what the proponent claims and (2) is sufficiently familiar with the record system used and (3) can establish that it was the regular practice of that business to make the record." Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 380 (2007) (quoting Hahnemann Univ. Hosp. v. Dudnick, 292 N.J. Super. 11, 18 (App. Div. 1996)).

When defendants' counsel moved to admit the records, the judge solicited a proffer. Counsel argued only that it was "an income statement table created by George, came out of George's computer," which counsel proposed

_____

[2] As Judge Contillo observed at the parties' first appearance before the court in the Chancery action Christine and Rachel filed: "It would be odd to be running partnership money through [a personal account with] a private Social Security number, that would make no sense. But stranger things have happened in family businesses."

could be admitted as "a business record created by a partner."  Counsel did not explain how Rachel, the witness through which he had proposed to admit the record, could testify the document was a partnership record, specifically an income statement, that she was at all familiar with George's record system, and that it was George's regular practice to make such a record.  Although "the foundation witness generally is not required to have personal knowledge of the facts contained in the record," Dudnick, 292 N.J. Super. at 17-18, she must satisfy the requirements of N.J.R.E. 803(c)(6).  As counsel was unable to lay a foundation for the admission of the computer records, we cannot find the court erred in excluding them.

There was no basis for an adverse inference based on Joan's failure to testify, even if defendants had raised this issue to the trial court, which they didn't.  Christine and Rachel could have easily called Joan to testify in their case — as Joan called them to testify in hers.  See ASHI-GTO Assocs. v. Irvington Pediatrics, P.A., 414 N.J. Super. 351, 361 (App. Div. 2010) (affirming trial court's denial of request for adverse inference charge regarding fact witness, who was "equally available to both sides").

Christine and Rachel have failed to produce proof that Joan ever averred that she had not succeeded to George's interest in the partnership on his death.

20

The point is, however, immaterial as defendants' counsel conceded to Judge DeLuca that if Joan wasn't a partner, George's estate certainly was, and she sued in her own behalf and as the executor of George's estate.

Defendants' argument, without case citation, that the court was without jurisdiction to rule on matters related to the trust and the Florida condominium is meritless. As Justice (then Judge) Pashman, while sitting in Chancery explained, "a court of equity can grant a judgment affecting title to foreign lands. Such a judgment does not operate as a conveyance of the land or as an in rem judgment, but the foreign land is affected indirectly due to the in personam operation of the judgment on the person of the defendant." Clark v. Judge, 84 N.J. Super. 35, 59 (Ch. Div. 1964), aff'd o.b., 44 N.J. 550 (E. & A. 1965).

Finally, we reject Christine and Rachel's argument that Judge DeLuca erred in appointing a receiver for the partnership. There is no question but that the appointment of a receiver, as Judge Jayne explained, "is an important adjudication which is rendered only with supreme caution and upon imposing and persuasive supporting proof." Neff v. Progress Bldg. Materials Co., 139 N.J. Eq. 356, 357 (Ch. 1947). But "the Chancery Division may, and should, take appropriate measures where the actions of the majority threaten to wholly

21

frustrate the legitimate expectations of the minority." Muscarelle v. Castano, 302 N.J. Super. 276, 284 (App. Div. 1997).

Christine and Rachel testified unabashedly that they had completely shut Joan out of the business of the partnership, refusing her any information even as to a contract to sell the partnership's only asset. As Judge DeLuca ruled, "[s]uch actions are a clear breach of defendants' fiduciary duties to Joan." Having reviewed the record, we are satisfied the judge properly executed his authority in appointing a receiver in this matter. See id. at 285.

Defendants' remaining arguments, to the extent we have not addressed them, lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3540-21